[No. C.D. 5637. En Banc. August 8, 1985.]

*In the Matter of the Disciplinary Proceeding Against* EUGENE A. STOCK, *an Attorney at Law.*

*Eugene A. Stock,* pro se.

*Robert D. Welden,* for Bar Association.

PEARSON, J.—The Disciplinary Board of the Washington State Bar Association has unanimously recommended that attorney Eugene Stock be disbarred from the practice of law for acts of ethical misconduct. After careful review of the evidence, we are unable to articulate a reason to depart from this recommendation. Accordingly, Mr. Stock's privilege to practice law in this state is now revoked.

Eugene Stock was admitted to the Washington bar in 1964. In 1981 he received two reprimands from the bar association. The first resulted from Stock's preparation, signing, and filing of a fraudulent corporate resolution on behalf of his client, Richard McClain. Stock stipulated that he knew the resolution was false when he prepared it.

The second reprimand related to Stock's activities as corporate secretary and attorney for a McClain corporation which marketed real estate. Stock, in attempting to sell these properties, knowingly made material misrepresentations which induced buyers to purchase the lots. Further, when Stock was promoting these lots, he knowingly violated a cease and desist order of the Washington Land Development Registration Administration, which had ordered the corporation, McClain, and Stock to stop marketing these properties. These two reprimands constitute the only prior disciplinary actions against Stock.

The present disciplinary proceeding results from various transactions between Stock and several clients. After hearing the testimony in the present proceeding, the hearing examiner recommended a 2–year suspension. The Disciplinary Board adopted the examiner's findings and conclusions in toto, but unanimously voted to disbar Stock. Stock now challenges a number of the findings and conclusions, as well as the sanction imposed.

The changes urged by Stock in the findings and conclusions all relate to the more minor details of this case. Stock has not challenged any of the major findings and conclusions. Thus, even if this court adopted his revised findings, the conclusions would be altered only slightly as a result. The disposition of this case does not rest upon any of the matters Stock has challenged. The record amply supports that serious code violations occurred, as reflected by the findings and conclusions.

The primary acts of misconduct by Stock relate to trust account violations and conflicts of interest which Stock failed to reveal to his clients and which were detrimental to those clients' interests. We detail only the most serious acts of misconduct below.

### 1. Client Kathleen Swartz/Executrix
### for Kahlor Estate

Ms. Swartz, as executrix of her mother's estate, hired Stock in 1980 as attorney for the estate.

A. In October 1980, Stock withdrew $5,200 of Kahlor estate funds from his trust account and loaned this money to Tides Inn, Inc. Tides Inn, Inc., was also a client of Stock's. The sole stockholder of Tides Inn was Jose Gonzales.

Stock admits he did not have the *prior approval* of Ms. Swartz, the estate executrix, to loan any estate moneys to his other client. He states he had discussed generally the possibility of investment of estate funds with Ms. Swartz, but she denies any such discussion. Nonetheless, Stock does not claim he had blanket authority to invest those funds without prior approval.

Stock informed Ms. Swartz of the loan several days later. She testified she felt the loan was a "rip–off" at the time Stock told her of that transaction. Stock now claims Ms. Swartz "ratified" the loan at that time; however, we find no evidence of such ratification.

The loan, which was to be repaid within 30 days, was fully repaid by February 1981, 4 months later. Nonetheless,

Stock's conduct violates CPR DR 9–102(A), (B) regarding the handling of client funds and CPR DR 1–102(A)(4) prohibiting acts of dishonesty and misrepresentation.

B. Stock received the repayment from Gonzales on behalf of the Kahlor estate. He deposited the funds into an account held by Ms. Swartz, rather than back into his trust account, from which he had withdrawn the funds. (The account held by Ms. Swartz was one she had managed as her mother's guardian and had not yet closed.)

Stock then "forgot" that the loan had been repaid or that he had deposited the money into the guardianship account. Meanwhile, the attorney for the heirs of the Kahlor estate, Mr. Powell, was requesting an accounting of the estate. Mr. Powell first requested this accounting in January 1981. Stock did not provide the first accounting until February 1982.

Stock's explanation for the prolonged delay in providing the requested accounting to the heirs is that he needed to verify the status of the Tides Inn loan before he could give such an accounting. He states he was unable to verify that Gonzales had repaid the loan until October 1981, even though he had personally accepted the funds from Gonzales. He then failed to provide that accounting until 4 months after he verified the status of the Tides Inn loan. Stock's behavior thus violated CPR DR 6–101(A)(3), which prohibits the neglect of a legal matter.

C. McClain, Stock's former client, called Stock inquiring whether Stock had any clients who would loan money to Robert Schoenbachler, a Seattle hairstylist. Schoenbachler sold hairpieces through his corporation, Schoenbachler 1520 Hair Design. At the time of this inquiry, McClain was a principal of that corporation and Stock became corporate attorney several months later.

In October 1980, Stock advised Ms. Swartz to loan Schoenbachler 1520 Hair Design $5,000. He did not advise her of his prior business and attorney/client dealings with McClain, nor that he had a personal business interest in the corporation. He did not tell her that he was by this

time the attorney for that corporation and he did not advise her to get independent counsel prior to loaning the money. Stock failed to recognize the conflict of interest inherent in this conduct. Thus, his behavior violated CPR DR 5–101(A) and CPR DR 5–105(B), which deal with conflicts of interest and the exercise of independent professional judgment.

On October 14, 1980, Ms. Swartz agreed to loan Schoenbachler $5,000 from her share of the Kahlor estate. However, Ms. Swartz testified that she called Stock the *next morning* to say she had decided *not* to make this loan. Stock informed Ms. Swartz that it was "too late" to change her mind.

On October 14, 1980, the day Ms. Swartz agreed to the loan, Stock transferred $5,000 from the Kahlor trust account to the benefit of Schoenbachler 1520 Hair Design on his ledger. He then disbursed those funds from his trust account as follows:

| | |
|---|---|
| 10/15/80 | $2,823.60 to pay for hairpieces |
| 10/24/80 | $600.00 and $436.18 to workman for carpentry at hair salon |
| 11/14/80 | $1,000.00 to Stock's former wife |
| 11/20/80 | $161.22 to Stock |

Thus, Ms. Swartz' $5,000 was still in Stock's trust account the next day when she called to cancel the loan. Even if she called *after* October 15 as Stock contends, over $2,000 of her money had not yet been given to Schoenbachler. Stock disbursed that $2,000 *after* Ms. Swartz changed her mind regarding the loan. This behavior by Stock violated CPR DR 1–102(A)(4) because it involves acts of dishonesty, fraud and deceit.

This conduct by Stock also involved self–dealing as evidenced by the fact that $1,000 of the $5,000 was disbursed to Stock's former wife. Stock's explanation for that disbursement is as follows. Stock's former wife received a 1974 Cadillac as part of their divorce settlement. She later sold this car to Schoenbachler, who gave her a promissory note

in return. He did not pay on that note. Thus, Schoenbachler owed Mrs. Stock $1,000; Stock used part of the Swartz loan to Schoenbachler to pay Mrs. Stock for the car. Again, this conduct violates CPR DR 1-102(A)(4), prohibiting dishonesty and misrepresentation.

Schoenbachler did not repay the October 1980 loan as scheduled; he still owes approximately $1,500 to Ms. Swartz.

### 2. Hildur Franke

Mrs. Franke and her husband employed Stock as their attorney in the 1960's. When Mr. Franke died in the late 1960's, Stock handled the closing of the estate for Mrs. Franke.

A. Pursuant to McClain's inquiry, Stock suggested to Mrs. Franke that she loan money to Schoenbachler. Stock was not at this time a principal in that corporation, nor was he corporate attorney. His only relationship to Schoenbachler at this time was through his long-time association with McClain.

Mrs. Franke loaned $14,500 to Schoenbachler in January 1980. The loan was to be repaid in monthly installments. Schoenbachler paid for a few months and then stopped. Schoenbachler then assigned a note, payable to the Schoenbachler corporation, to Mrs. Franke in the sum of $12,500. No payments were made on this note by the promisor.

Subsequently, Mrs. Franke employed another attorney, Mr. Millikan, who filed suit against the promisor and Schoenbachler on the note.

By that time Stock was a director and officer of Schoenbachler's corporation; he was also attorney for the corporation. As such, he represented the corporation in the lawsuit filed on behalf of Mrs. Franke, who also had been his client. This situation presented a serious conflict of interest for Stock and is a violation of CPR DR 5-105(B) and CPR DR 5-101(A), related to conflict of interest and exercise of independent professional judgment.

Mrs. Franke obtained a default judgment against the promisor. The promisor has not paid Mrs. Franke any money to date on the judgment. Thus, she is still owed approximately $13,000 on the loan to Schoenbachler.

B. In September 1980, Stock asked Mrs. Franke to loan him $12,285. Stock wanted the cash to help his former wife buy a condominium in Seattle. In exchange for the cash, Stock's former wife transferred a piece of real property in Marysville to Stock.

Mrs. Franke did loan Stock $12,285 at 12 percent interest. Stock did not advise her to obtain independent legal counsel first; again, this situation created a conflict of interest for Stock.

Stock gave Mrs. Franke a promissory note in return for the cash. That note stated that the loan was secured by a mortgage. Stock never prepared such a mortgage to secure the note, however. This is dishonest behavior in violation of CPR DR 1–102(A)(4).

Stock paid between $1,500 and $3,000 on the note and then became unable to pay Mrs. Franke. In December 1981, Mrs. Franke's new attorney brought an action against Stock on the note and obtained a judgment against Stock for approximately $12,000, plus interest. Stock has not yet paid Mrs. Franke any money on that judgment.

### 3. Fred Edick

In 1981, after Stock became an officer, director, and shareholder in Schoenbachler's corporation, Stock had business dealings on behalf of the corporation with Mr. Edick. The Schoenbachler corporation owed Edick about $1,700 for hairpieces; that account was delinquent.

In his communications with Edick, Stock only related he was the *attorney* for the corporation and not that he was also an officer, director, and shareholder. Thus, Stock failed to reveal his *personal* interest in the corporation. Acting under the pretense that he had only a professional interest in the corporation, Stock made arrangements with Edick for payment on the delinquent account.

Very shortly after Stock mailed the agreed payments to Edick, Stock stopped payment on two of the checks. Stock explained that his account was garnished, in an unrelated matter, so he closed it. He further stated that he did not notify Edick he was stopping payment because he was hoping to get the money from Schoenbachler right away to send to Edick. He did not, however, get any money from Schoenbachler and Edick did not receive full payment.

In March 1982, again professing to act only as attorney for the corporation, Stock made a new agreement with Edick. Edick delivered hairpieces to Schoenbachler on Stock's promise to send all money obtained from the sale of those pieces directly to Edick. Stock sent Edick $500; Edick had billed $2,484.50 for those hairpieces. The balance owed to Edick for the hairpieces delivered in March has never been paid. Stock's deceptive behavior regarding his self–interest in the corporation violated CPR DR 1–102(A)(4), which prohibits dishonesty and deceit.

In addition to these most serious acts of ethical misconduct, Stock committed numerous less serious violations. Generally, Stock's trust account was mismanaged, which resulted in numerous *negative* balances on various clients' accounts. CPR DR 9–102(A), (B)(3). He deposited advance fees into his general account and spent the money *before* he earned it. CPR DR 9–102(A). He failed to refund promptly moneys held in escrow after the transaction had been canceled. CPR DR 7–101(A)(3). He accepted personal property from Schoenbachler as collateral for the Kahlor estate loan but did not seek an independent appraisal of the value of that property; he later released the collateral before the loan had been repaid. CPR DR 7–101(A)(3).

In sum, this record shows numerous ethical violations, many very serious in nature. We turn now to an examination of the appropriate sanction to be applied.

■ This court has adopted the general rule that, absent extraordinary mitigating circumstances, disbarment is the usual sanction for misappropriation or misuse of client funds. *In re Noble,* 100 Wn.2d 88, 92, 667 P.2d 608 (1983);

*In re Moynihan,* 97 Wn.2d 237, 238, 643 P.2d 439 (1982); *In re Kumbera,* 91 Wn.2d 401, 403, 588 P.2d 1167 (1979). Disbarment, however, is not the *automatic* sanction. The facts of each case will be studied and all relevant aggravating or mitigating factors will be considered. *In re Salvesen,* 94 Wn.2d 73, 76, 614 P.2d 1264 (1980).

 Very recently, in *In re Noble, supra,* this court articulated a number of factors that are to be considered in every disciplinary case. We have applied these factors to Stock's situation.

The first factor to be considered is the purpose of attorney discipline. The purpose is twofold: (1) public protection and (2) deterrence of other attorneys. This court cannot ever be certain that the public is safe from repeated acts of misconduct by an attorney. The most this court can do is weigh the factors presented and make an educated prediction as to the likelihood that an attorney will not act unethically in the future.

Here, Stock recognizes verbally that he has committed some serious acts of misconduct, but urges that he can be "rehabilitated" such that a 90–day suspension, a program for restitution, and periodic trust account audits would protect the public. While he does not blame McClain for any of his misconduct, he sees his relationship with McClain as a contributing factor and has accordingly eliminated that relationship.

Further, Stock urges that his involvement in these disciplinary proceedings has provided insight into his misconduct. Of significance, his prior reprimands resulted from his association with McClain and came after some of the events which are the subject of this proceeding. In other words, Stock asserts that he has "learned a lesson" as a result of those reprimands and has, since then, made efforts to comply with the Code of Professional Responsibility. Stock further notes that he has not misused client funds for his *personal* benefit and urges that he is less culpable than an attorney who converts client funds to his own personal use. Moreover, he denies any dishonest intent as to his trust

account violations.

We find, however, that Stock has not evidenced that he has sufficient awareness of the seriousness of his transgressions so as to assure this court that he will not repeat this type of behavior. Stock has offered verbally to make restitution to his clients as a condition of reinstatement to full practice. He has not, however, initiated such restitution.

We recognize that Stock has been suspended since January 1985 pending the outcome of this proceeding. We thus realize that restitution since that time has probably not been feasible. Nonetheless, Stock made no restitution to Mrs. Franke prior to January 1985, even though she obtained a judgment against Stock in 1982. Regardless of any financial difficulties Stock may have experienced between 1982 and 1985, we find it significant that he never made even the smallest payment toward that debt. Thus, whether Stock sincerely appreciates the seriousness of his acts is questionable.

Further, because Stock does not recognize the conflict of interest inherent in advising his clients to loan money to his other clients or to his associates, we are concerned that Stock will again become involved in these conflicts of interest.

Stock's argument that he is less culpable than an attorney who uses client money to his personal benefit shows a lack of understanding of the rules regarding trust funds. We disagree that it shows a higher degree of dishonesty to misuse client money to one's own benefit than to use it to the benefit of other clients or one's friends. The client whose money is misused is equally harmed in either case; the profession is made to look disreputable in either case. Moreover, because Stock did have a personal interest in Schoenbachler's corporation, he did misuse clients' money to his own benefit when he advised those clients to loan money to that corporation without benefit of independent advice.

In sum, Stock has not taken measures to compensate his clients. He states that he has learned from his errors; yet,

he is still unable to recognize conflicts of interest which are quite blatant. Accordingly, the record provides no assurance that Stock will not repeat his transgressions.

The second *Noble* factor is proportionality of the sanction to the attorney's misconduct. Comparison to factually similar cases is used to make this determination. It is here that mitigating and aggravating factors are considered, as well.

Here, Stock committed serious trust fund violations. This court has reacted to such conduct by disbarment of the offender in numerous cases. *See In re Rosellini,* 97 Wn.2d 373, 377–78, 646 P.2d 122 (1982). Accordingly, disbarment of Stock would not be disproportionate to the sanction imposed on other attorneys similarly situated.

Furthermore, Stock has committed serious conflict of interest transgressions and has acted with questionable honesty in other instances. These acts alone could result in disbarment. *See In re Eddleman,* 63 Wn.2d 775, 389 P.2d 296, *cert. denied,* 379 U.S. 990 (1964).

Of the mitigating factors recognized by this court, the following factors apply to Stock:

1. Full cooperation with the bar. *See In re Noble,* 100 Wn.2d 88, 667 P.2d 608 (1983).

2. No attempt to conceal his transgressions.

3. Recognition that some of his acts were improper. *See In re Rosellini, supra.*

The following aggravating factors apply to Stock:

1. Lack of voluntary restitution. *See In re Rosellini, supra.*

2. Prior misconduct for acts involving dishonesty, deceit, misrepresentation and fraud.

3. Serious nature of transgressions involving extensive financial loss to clients.

4. Pattern of misconduct shown in that several clients were involved over a period of 2 years. *See In re Zderic,* 92 Wn.2d 777, 600 P.2d 1297 (1979).

5. Failure to recognize, even at this point, the conflict of interest situations with which he was faced.

Based on these factors, in comparison to factually similar cases, the appropriate sanction is disbarment. The aggravating factors are not sufficiently ameliorated by Stock's cooperation and partial acceptance of responsibility where those are the only mitigating factors. *See in re Rosellini, supra; In re Salvesen,* 94 Wn.2d 73, 614 P.2d 1264 (1980).

The third *Noble* factor we consider is the effect of the sanction on the attorney. Here, the court weighs the nature of the conduct against the hardship imposed upon the attorney by the recommended sanction. The nature of Stock's misconduct is very serious. His clients have lost significant sums of money; he has acted, if not always with dishonesty, at least with total disregard for his clients' welfare. Thus, the hardship of disbarment is not disproportionate to his acts.

Finally, the Board was *unanimous* in its recommendation to disbar Stock. This court will hesitate to reject a unanimous decision of the Board. *In re Noble, supra.* We held in *In re Noble* that the Board's recommendation should be affirmed unless the court can articulate a specific reason to reject the recommendation.

No set of facts or circumstances has been shown by Stock which mitigate his serious ethical transgressions. We therefore are unable to articulate any reason to depart from the Board's recommendation of disbarment. Accordingly, Eugene A. Stock is disbarred and his name is to be stricken from the roll of attorneys in this state.

DOLLIVER, C.J., and UTTER, BRACHTENBACH, ANDERSEN, CALLOW, GOODLOE, and DURHAM, JJ., concur.

DORE, J., concurs in the result.