[No. C.D. 7663.   En Banc.   November 26, 1986.]

*In the Matter of the Disciplinary Proceeding*
*Against* GARY W. RENTEL, *an*
*Attorney at Law.*

*Robert T. Farrell,* for Bar Association.

*Gary W. Rentel,* pro se, and *Monte E. Hester,* for respondent.

ANDERSEN, J.—

FACTS OF CASE

At issue in this case is the appropriate sanction to impose upon an attorney who misappropriated client funds while addicted to cocaine and alcohol.

Respondent Gary W. Rentel was admitted to practice law in the State of Washington on November 16, 1972. In 1974 he became an associate with a law firm, and in 1980 joined a Tacoma firm as a partner.

Respondent drank socially until he became an attorney whereupon his drinking increased. In 1977, his alcohol consumption began to interfere with his marriage. In 1978 respondent and his wife separated. He then sought psychiatric treatment for depression.

Respondent continued to practice law. He also continued

to drink. By 1981, he was drinking daily beginning at noon and consuming 10 to 15 drinks a day. Respondent and his wife divorced at the end of 1981. Before the divorce was final, and as early as 1978, respondent used cocaine. By the end of 1981 he was addicted; respondent used 1 to 1½ grams of cocaine daily while consuming 10 to 15 drinks daily.

Respondent continued to practice law despite his cocaine and alcohol addictions. On February 17, 1983, he received a formal complaint from the bar association charging him with violating CPR DR 7–104(A)(2) in that he had given advice to an unrepresented person when the interests of that person conflicted with his client's interests. The complaint also charged respondent with violating CPR DR 1–102(A)(4), which prohibits conduct involving fraud, deceit, dishonesty or misrepresentation.

On March 5, 1983, one of respondent's partners confronted him with a client's claim that respondent had received and kept funds belonging to the client. After the partner examined the file and discovered that respondent had taken the client's money, he informed the bar association. Further investigation revealed additional misappropriations. With respondent's consent, he was suspended from practicing with his firm.

On March 18, 1983, respondent voluntarily suspended himself from the practice of law altogether. His clients were notified of his voluntary suspension. Then on April 6, 1983, this court entered an order formally suspending respondent from the practice of law pending the outcome of disciplinary proceedings against him. On July 7, 1983, respondent was admitted into the Kirkland CareUnit for treatment of alcoholism and drug addiction.

On November 4, 1983, the bar association amended its earlier complaint to charge respondent with misappropriating the funds of eight clients between March and December 1982. The complaint was further amended on March 30, 1984, to add another misappropriation charge. The total client funds taken exceeded $26,000. The com-

plaint noted that some of the misappropriated funds had been repaid. Respondent admitted taking the money in each instance, but stated that he suffered from diminished mental capacity and/or disability at the time of each theft.

Disciplinary proceedings against respondent were delayed while he was tried on 12 counts of felony theft in Pierce County Superior Court. Respondent stipulated to taking the money, but contended that he was not criminally liable because of his diminished mental capacity and his lack of intent to steal. A jury acquitted respondent on all 12 counts.

The disciplinary hearing began on June 25, 1984. Respondent admitted misappropriating client funds, but maintained that he remembered nothing about the incidents and took the money only because his reasoning was totally impaired by his alcohol and cocaine addiction. Several witnesses testified, however, that respondent functioned competently as an attorney during the period of his addictions. A psychiatrist who examined respondent at the bar association's request made three psychiatric diagnoses: narcissistic personality disorder of long–standing duration; continuous cocaine abuse during 1981, 1982 and 1983; and continuous alcohol dependence from 1976 through 1983.

The hearing officer concluded that respondent did engage in the charged acts of misconduct, which included misappropriation of client funds, failure to make full accountings and the giving of advice to a nonclient whose interests conflicted with those of his client. The hearing officer did not consider disbarment appropriate, however, because he found that during 1981, 1982 and 1983 respondent "was suffering from diagnosed personality disorders, depression, narcissistic personality, alcohol addiction and cocaine addiction, all of which were medical problems which had a profound effect upon his judgment." The hearing officer also noted respondent's apparently successful treatment at CareUnit and his involvement with Alcoholics Anonymous and Cocaine Anonymous. Respondent is now a mortgage banker and works as a volunteer at CareUnit.

The hearing officer recommended that respondent be suspended for 15 months commencing April 6, 1983. Since the hearing officer's decision was rendered on March 15, 1985, its effect would be immediate reinstatement for the respondent. The hearing officer also recommended a 10–year probationary period (increased from 5 years at respondent's request) which would involve conditions such as respondent's "intense involvement" with Alcoholics Anonymous, supervision by a committee of three attorneys, blood or urinalysis tests on 12 hours' notice and counseling from a certified alcohol and drug counselor.

On May 3, 1985, the Disciplinary Board reviewed the case. No oral argument was requested, and none was heard. On July 1, 1985, the Board rendered its decision adopting and modifying the hearing officer's decision. The Board made two additions to the findings of fact. One was drawn from the testimony of Dr. Petrich, the psychiatrist who examined respondent: "However, Mr. Rentel's ability to perceive reality was not so impaired that he could not distinguish between his money and his clients' money." The second addition also was based on the psychiatrist's deposition testimony:

> According to the testimony of Dr. Petrich, people such as Mr. Rentel, with a narcissistic personality, are more vulnerable to alcohol and drug abuse, and it is extremely difficult for such persons to sustain a remission from use of alcohol or drugs.

The Board struck the hearing officer's recommendation and ordered that respondent (1) be required to make restitution to any client not yet fully reimbursed for funds misappropriated by respondent and (2) be disbarred. The Board's vote was 9 to 0.

Respondent moved for reconsideration and requested that oral argument be permitted at the time of the hearing on the motion for reconsideration. The Board denied the motion for reconsideration and the request for oral argument. It also assessed costs and expenses against respondent.

Respondent then appealed the bar association's disbarment recommendation to this court.[1]

We are presented with one ultimate issue.

ISSUE

What is the appropriate sanction for an attorney who, while addicted to alcohol and cocaine, misappropriates more than $26,000 of client funds over a 10-month period?

DECISION

CONCLUSION. In order to protect the public and to maintain our strong policy against misappropriation of client funds, a majority of this court concludes that the only sanction appropriate under the circumstances presented here is disbarment.

Respondent initially raises several procedural issues. First, he argues that the Disciplinary Board erred in denying his motion for reconsideration and his request for oral argument. Respondent had the right to present oral argument at the May 3, 1985 review of his case before the Disciplinary Board.[2] Neither respondent nor his attorney requested oral argument. The right to so argue was thus waived.[3] Our rules do not provide for the Disciplinary Board reconsidering its own decision. The Board therefore did not err when it denied respondent's motion as well as his request to orally argue that motion.[4]

Respondent also requested that oral argument and testimony be presented to this court or that his case be remanded to the Board for further proceedings. RLD 7.7(a) provides that oral argument before this court will be conducted under the provisions of Title 11 of the Rules of Appellate Procedure, unless we otherwise direct. There is

---

[1]RLD 7.2(a).

[2]RLD 6.7(c).

[3]*In re Fortun*, 97 Wn.2d 240, 241, 643 P.2d 447 (1982).

[4]*See* RLD 4.8(c).

no provision in Title 11 for allowing testimony, nor do we regard it as necessary here. The record presented is sufficient for us to reach a decision. Respondent was allowed to speak to this court on his own behalf. We deem further proceedings unnecessary.

The main issue here presented, of course, is whether the appropriate sanction is disbarment, as recommended by the Disciplinary Board. In deciding this issue, we have recourse to the very helpful analytical framework proposed by the American Bar Association, *ABA Standards for Imposing Lawyer Sanctions* (1986).

▮ We note initially the purpose of lawyer discipline as stated by the American Bar Association's Sanctions Committee:

> The purpose of lawyer discipline proceedings is to protect the public and the administration of justice from lawyers who have not discharged, will not discharge, or are unlikely properly to discharge their professional duties to clients, the public, the legal system, and the legal profession.

*Standard* 1.1, at 7. This statement coincides with this court's traditional position that the purposes of attorney discipline are to protect the public and to preserve confidence in the legal system.[5]

In satisfying these basic purposes of bar discipline, the consequence of disciplining an errant attorney is unavoidably punitive to some extent.[6] Indeed, as observed in *In re Little,* 40 Wn.2d 421, 431, 244 P.2d 255 (1952):

> The final adjudication should provide neither more nor less than the facts fairly required to penalize the offender, deter others, and indicate to laymen and members of the bar that proper discipline will be enforced and the standards of the profession maintained.

▮ In determining how best to fulfill the purposes of

---

[5]*In re Kumbera,* 91 Wn.2d 401, 403, 588 P.2d 1167 (1979); *In re Little,* 40 Wn.2d 421, 430, 244 P.2d 255 (1952).

[6]*Little,* at 430.

bar discipline in any given disciplinary case, the ABA Sanctions Committee recommends that four questions be addressed. We commend this analysis. The questions are as follows:[7]

1. What ethical duty did the lawyer violate?

2. What was the lawyer's mental state?

3. What was the extent of the actual or potential injury caused by the lawyer's misconduct?

4. Are there any aggravating or mitigating circumstances?

We will use this analytical framework and answer each of these questions in discussing what we consider to be the appropriate sanction to impose on the respondent in this case.

We initially observe that respondent violated ethical duties owed not only to his clients, but also to the general public and the legal system. By disregarding CPR DR 9–102(B) (which requires a lawyer to preserve his client's property) and CPR DR 1–102(A)(4) (which prohibits conduct involving fraud, deceit, dishonesty, or misrepresentation), respondent violated the duties of loyalty and candor owed his clients.[8]

Respondent's violation of CPR DR 1–102(A)(3) (which prohibits illegal conduct involving moral turpitude), as well as his violations of CPR DR 1–102(A)(4), means that he also infringed upon duties owed to the general public.

> Members of the public are entitled to be able to trust lawyers to protect their property, liberty, and their lives. The community expects lawyers to exhibit the highest standards of honesty and integrity, and lawyers have a duty not to engage in conduct involving dishonesty, fraud, or interference with the administration of justice . . .

*Standards*, at 5; *see also In re Case*, 59 Wn.2d 181, 184, 367 P.2d 121 (1961).

---

[7] *ABA Standards for Imposing Lawyer Sanctions*, at 5 (1986).

[8] *See Standards*, at 5.

Respondent similarly transgressed upon duties owed the legal system when he violated CPR DR 7–104(A)(2) (which forbids a lawyer from giving advice to an unrepresented person if the interests of that person conflict with those of a client). "Lawyers must always operate within the bounds of the law, and cannot create or use false evidence, or engage in any other illegal or improper conduct . . ."[9]

Once having determined the ethical duties violated, a relevant factor for consideration then appropriately becomes what mental state the attorney possessed when he or she committed the violations in question. According to the *ABA Standards,* the mental states to be given consideration are defined as follows.

> The most culpable mental state is that of intent, when the lawyer acts with the conscious objective or purpose to accomplish a particular result. The next most culpable mental state is that of knowledge, when the lawyer acts with conscious awareness of the nature or attendant circumstances of his or her conduct both without the conscious objective or purpose to accomplish a particular result. The least culpable mental state is negligence, when a lawyer fails to be aware of a substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the standard of care that a reasonable lawyer would exercise in the situation.

*Standards,* at 6.

Respondent claims that he has no memory at all of his misappropriations, and that his alcohol and cocaine addictions so affected his mind that he was totally unaware of what he was doing when he took his clients' funds.

We are aware that alcoholism impairs a person's judgment and sometimes causes blackouts or memory deficits. We are also aware that cocaine is an insidious drug that can affect a person's mind. The impact of cocaine in general, and upon respondent in particular, was vividly described by the psychiatrist who examined him:

---

[9]*Standards,* at 5; *see also In re Vetter,* 104 Wn.2d 779, 793, 711 P.2d 284 (1985).

[C]ocaine appears to be the most addicting substance yet known to medical science. Cocaine is a derivative of natural stimulants which has an extremely rapid onset of action and an extremely short duration of action. The effects are a euphoria almost unique to human experience. The combination of the unique euphoria and the short duration of action can cause extreme addiction in any animal. There are studies in monkeys showing that these individuals who prefer cocaine to food and water, will use cocaine until they die of either malnutrition or dehydration. They are totally unable to control their behavior in order to stop cocaine, and must be physically restrained and prevented from obtaining the drug. It is my opinion that Mr. Rentel's cocaine addiction was on the same level of the experimental addiction seen in monkeys.

The same psychiatrist also noted, however, that respondent's ability to distinguish between his money and his client's money was not totally impaired. Nor did he detect that respondent thought his law firm owed him the money:

His thinking and thoughts did not appear to be impaired to the point where he was irrationalizing or . . . delusional in his belief that this money was really his or that his partners had unfairly deprived him of his deserved money and the only way he could get them was by taking them unilaterally and things like that. I did not detect any of those things.

Moreover, judges before whom respondent appeared, attorneys against whom he argued, and even his own secretary thought that respondent functioned as a competent attorney during the period of his cocaine addiction. As one psychiatrist with 15 years' experience in substance abuse problems has stated with reference to cocaine, "A person can be high and still function well—that is, until he becomes absolutely paranoid."[10] Based on the psychiatrist's testimony, the testimony of those with whom respondent worked, and the findings of fact set forth by the Disciplinary Board, we conclude that respondent took $26,000 over a 10-month period with knowledge of what he was doing.

---

[10]*Cocaine Blues,* 72 A.B.A. J. 25, 26 (May 1, 1986).

Under the facts here presented, whether the defendant is deemed to have "intended" to steal, or merely to have had "knowledge" of his actions, is immaterial; his mental state and conduct are both culpable in the extreme.

The third question to be addressed by this analysis is the extent of the actual or potential injury caused by the lawyer's misconduct. The extent of the injury is defined by the type of duty violated and the extent of actual or potential harm caused. The following hypothetical from the *ABA Standards* is helpful in considering this question:

> [A]ssume that the client gave the lawyer $100 as an advance against the costs of investigation. The lawyer took the money, deposited it in a personal checking account, and used it for personal expenses. In this case, where the lawyer acted intentionally and the client actually suffered an injury, the most severe sanction—disbarment—would be appropriate.

*Standards,* at 6.

Here we have a lawyer who took more than $26,000 in client funds and used it for personal expenses; that is, to buy cocaine. Nine clients suffered serious financial injury, and the public and legal profession were injured as well. Such injury warrants a severe sanction.

■■■ By now, it can come as no surprise to the bar that so far as this court is concerned a lawyer's failure to preserve the integrity of client funds leads to disbarment, absent extraordinary mitigating circumstances.[11] In discussing what mitigating factors, if any, will lessen the sanction usually imposed for misappropriating client funds, we reach the final question posed by the ABA Sanctions Committee, namely, whether there are "any aggravating or mitigating circumstances?"[12] We have, on occasion, held that alcoholism is a mitigating circumstance in misappropriation

---

[11]*In re Noble,* 100 Wn.2d 88, 92, 667 P.2d 608 (1983); *In re Moynihan,* 97 Wn.2d 237, 238, 643 P.2d 439 (1982).

[12]*See also Kumbera,* at 405; *In re Stock,* 104 Wn.2d 273, 283, 704 P.2d 611 (1985).

cases.[13] We emphasize here, however, that alcoholism is only a *mitigating* factor, and will only be considered as such in certain circumstances; it does not *excuse* an attorney's misconduct. We agree with the Illinois Supreme Court:

> Perhaps in rare cases alcoholism might so change the character of the misconduct or so distort the attorney's state of mind as to provide a complete excuse. Usually, however, alcoholism is at most an extenuating circumstance, a mitigating fact, not an excuse. The attorney's impaired judgment diminishes the responsibility he must bear, but does not eliminate it. Not all alcoholics appropriate the money of their clients; the slide from drink to dishonor may be smooth, but it is neither automatic nor uncontrollable. We can understand it; we cannot excuse it or overlook misconduct as serious as respondent's. Alcoholics need not be treated just like other people; our duty to uphold the standards and reputation of the profession is not incompatible with sympathy and leniency for victims of alcoholism. But their tragedy cannot be used as a license to exploit clients by taking their money.

*In re Driscoll,* 85 Ill. 2d 312, 316, 423 N.E.2d 873 (1981).

Even looking sympathetically upon respondent's alcoholism, however, that addiction is only part of the story here.

From 1981 to 1983, a 3-year period, respondent was a cocaine addict as well as a practicing attorney. The use of alcohol is legal; the use of cocaine is not. Each time respondent used cocaine during those 3 years, he engaged in a felony having a maximum penalty of 5 years' imprisonment and a $10,000 fine.[14] Respondent testified that he often pooled his money with others to buy cocaine. While there is no evidence that respondent sold cocaine, he effectively helped others buy this insidious drug and sustain their addictions.

Although the respondent was acquitted of felony theft, conviction thereof in the criminal courts is not a condition

---

[13]*See Noble,* at 98.

[14]*See* RCW 69.50.401(d).

precedent to disciplinary action.[15] The fact remains that respondent undeniably took client funds to support his cocaine habit. Such a repetitive pattern of misconduct demands more severe sanctions than an isolated violation.[16]

Respondent's use of alcohol was not illegal and began in a social manner. His use of cocaine, while illegal in nature, at least in the beginning was likewise of a casual and experimental nature. At some point in time, however, while still functioning in a relatively normal manner, he abandoned his volition, his freedom of choice and indeed, his responsibility. Thus at some point in time, while the choice was still his, respondent chose the path which ultimately led to his cocaine addiction. Volition, freedom and responsibility fell to addiction. Whether he, as an individual, with all of his personality traits, recognized that critical step over the border can never really be known to this court. We can acknowledge that at some point he lost control either in a psychological or physiological sense, or both, yet that loss can only *explain*; it cannot *justify* his conduct to the clients, to the profession or to the public.

■ Respondent argues that under our previous cases involving misappropriation of client funds, we *must* conclude that disbarment is too severe a sanction for his misconduct.[17] This is a misuse and misunderstanding of the function of precedent in disciplinary cases. Broad guidelines are laid down in the cases involving lawyer discipline, but no case is absolutely binding precedent for future cases. Considering the whole spectrum of facts, offenses, attitudes, cooperation or noncooperation, rehabilitation, client losses and the length of suspension, it is at once apparent that bar discipline must be tailored to fit the facts of each particular case. No prior case *absolutely* mandates a particular result in any subsequent proceeding.

---

[15]RLD 1.1(a); *In re Fortun,* 97 Wn.2d 240, 242, 643 P.2d 447 (1982).

[16]*Noble,* at 93; *Moynihan,* at 239.

[17]*See Noble,* at 99; *In re Salvesen,* 94 Wn.2d 73, 79, 614 P.2d 1264 (1980).

Drug and alcohol addiction poses an especially troublesome problem because of the difficulty of predicting future avoidance of substance abuse. Indeed, respondent may well be more susceptible to substance abuse than others. As the psychiatrist who examined him observed in this case, "[g]enerally speaking, people with the narcissistic personality are considered to be more vulnerable to alcohol and drug abuse." The doctor also replied "yes" to this question: "And the afflictions of drug abuse and alcohol abuse are also in and of themselves extremely difficult to sustain on remission; is that correct?" Other experts have noted the difficulty of overcoming cocaine addiction alone:

"Coke is physically addicting but the psychological craving for it is even stronger . . . It takes years before anyone can be sure they have cleaned up."

. . .

"Nationally, of the people who present themselves for treatment, just 15 to 17 percent stay off cocaine for more than a year," . . .

*Cocaine Blues,* 72 A.B.A. J. 25, 26 (May 1, 1986). It was the respondent himself who requested a doubling of the 5–year probationary period originally proposed by the hearing officer.

In sum, we conclude that the 10–year probationary period proposed by the hearing officer is an unwieldy and unauthorized solution to the problem presented by the facts of this case. In the first place, such a sanction would impose an enormous, and perhaps impossible, burden upon the bar and others responsible for monitoring respondent's conduct. But more importantly, as discussed above, we concur with the Disciplinary Board's recommendation of disbarment to emphasize our strong policy against client fund violations and to protect the rights of clients, the public, the legal system and the legal profession as fully as possible.

Respondent Gary W. Rentel is disbarred and his name stricken from the roll of attorneys in this state. The costs of

this proceeding are hereby assessed against respondent.

BRACHTENBACH, DORE, CALLOW, and DURHAM, JJ., concur.

GOODLOE, J. (dissenting)—I disagree that disbarment is the appropriate sanction. I would accept the recommendation of the hearing officer that respondent Gary W. Rentel be suspended for 15 months and placed on 10 years' probation. This sanction adequately protects the public, the administration of justice, and the legal profession.

The majority posits the issue in this case as follows: "What is the appropriate sanction for an attorney who, while addicted to alcohol and cocaine, misappropriates more than $26,000 of client funds over a 10–month period?" Majority opinion, at 281. By stating the issue in this posture the majority ignores a significant aspect of this case—Rentel's rehabilitation. The majority's only statement is that "[t]he hearing officer also noted respondent's apparently successful treatment at CareUnit and his involvement with Alcoholics Anonymous and Cocaine Anonymous." Majority opinion, at 279. This is only part of the story.

Rentel voluntarily sought and received treatment for his alcoholism and chemical dependency. On July 7, 1983, Rentel was admitted as a patient to the Kirkland CareUnit for treatment of diagnosed alcoholism and drug addiction. Fellow Tacoma attorneys partially paid for this treatment. Rentel successfully completed a 28–day in–patient program under the supervision of Sandra Counts, M.D., Logan Baldwin, an alcohol counselor, and Dr. Joseph Zohn, a psychologist. Rentel was considered a model patient and assisted other patients. He completed after care treatment positively, which included attending counseling on a weekly basis for 12 weeks. As of August 1984, when the hearing was held, Rentel was an active member of Alcoholics Anonymous and Cocaine Anonymous, attending meetings 4 to 5 times per week and had also continued his weekly counseling sessions. Rentel had also become Director of the Care-

Unit Alumni Association. He volunteers his time in helping with intervention with new patients and speaking to groups for purposes of educating them as to the terrible consequences of alcoholism and drug addiction.

Rentel has been employed since October 12, 1983, as a mortgage banker. He has successfully coped with the stress and demands of the job. He has been sober and straight since 1983. The testimony before the Disciplinary Board indicates that the prognosis for Rentel is good. His continued voluntary involvement with Alcoholics Anonymous, Cocaine Anonymous, and the CareUnit are indications that Rentel will be likely to sustain a remission from his prior addictions.

An important consideration which the majority fails to consider is: What recognition, if any, do we give to the rehabilitative efforts that an attorney has made to overcome alcoholism and chemical dependency? I believe we should give such rehabilitation serious consideration and great weight. With this in mind I move to the analytical framework proffered by the majority.

Contrary to the majority, I believe that an analysis of the four questions recommended by the ABA Sanctions Committee warrants the conclusion that disbarment *is not* the appropriate sanction. The four questions are: (1) What ethical duty did the lawyer violate? (2) What was the lawyer's mental state? (3) What was the extent of the actual or potential injury caused by the lawyer's misconduct? (4) Are there any aggravating or mitigating circumstances?

I agree with the majority that the respondent violated ethical duties of a serious nature. I disagree, however, with the majority's analysis of Rentel's mental state. The majority states that during his addictions respondent appeared to function as a competent attorney. Further, it notes that one psychiatrist stated "that respondent's ability to distinguish between his money and his client's money was not totally impaired." Majority opinion, at 285. This leads the majority to conclude "that respondent took $26,000 over a 10–month period with knowledge of what he was doing." Majority

opinion, at 285.

This conclusion is inconsistent with a consideration of all the evidence. The record indicates that when confronted by a partner with an allegation of misappropriation, Rentel reviewed the file and discovered that he had in fact taken the client's funds. He then obtained counsel following which they reviewed all of his files and discovered further evidence of misappropriation. This implies that Rentel was not aware that he had taken client funds until he discovered he had done so upon a self–instigated review of his files.

The record also includes the testimony of Sally Hartley, a counselor at the CareUnit, who gave the following description as to the effect of alcoholism:

> I'm thinking specifically of what we call a short–term memory loss while drinking as Gary was doing on a daily basis. We call that maintenance drinking. And black–outs are very common. They may last for a short time such as 15 minutes, they may go on for—a person may be in and out of an alcoholic black–out for days. During that time, a person does think, performs. One patient I know, who was a professor, got up and lectured and the person does not recall having done [so].
>
> The way it has been explained to me is that the memory cells are so sedated that they do not record so there is no recollection of what has been said or done, even though the person is walking, talking, seems rational to others.

Report of Proceedings III, at 48–49. Hartley further testified as follows:

> As a recovering alcoholic myself, I have done many things in alcoholic black–outs. . . . I recall many times when I would make promises to do things and would be astonished to find out that I had obligated myself to do something and had no recollection whatever of having done so. None.
>
> I have seen this with countless alcoholics and it's a phenomena that is hard for nonalcoholics to believe exists.

Report of Proceedings III, at 55.

Dr. Sandra Counts, Medical Director at CareUnit, testified that alcohol and cocaine addiction can alter perceptions of reality. An altered perception of reality

> can take the form of delusions which are thoughts that people have which are unreal or about things that are not in reality or they take the form of hallucinations which are hearing things, seeing things, feeling things, alter[ed] perceptions of what's in the environment.

Report of Proceedings III, at 105.

Dr. Joseph Zohn, a licensed psychologist who worked at CareUnit at the time Rentel was there, testified that Rentel said that he was not sure of what had happened insofar as his misappropriation of client funds was concerned. Report of Proceedings III, at 138. Zohn further testified:

> [I]t seemed so self evident that it happened because [Rentel] was addicted, he was using, there seemed to be a lot of confusion in his life and with the decisions that he made. And, if I'm not mistaken, there was mismanagement of funds across the board pretty much, even in his personal bill paying and other things, too.

Report of Proceedings III, at 138.

The hearing officer and the Board found that the alcohol consumed by Rentel during 1981, 1982, and part of 1983 severely impaired his judgment. Further, Rentel's addiction to alcohol and cocaine substantially affected his perception and conscious control of reality. I believe the evidence indicates that Rentel's perception of reality may have been so distorted that he reached conclusions that were obviously not correct. It is apparent from the evidence that Rentel was suffering from a severe illness. This illness dominated his being for a crucial period of time with devastating effects. Unlike the majority, I am unable to conclude that Rentel misappropriated client's funds with knowledge of what he was doing.

The third concern expressed by the ABA Sanctions Committee is the extent of the actual or potential injury caused by the lawyer's misconduct. I agree that Rentel's actions did cause serious financial injury, and injured the

legal profession as well. However, he has taken steps toward reparation. At the time of the hearing at least four clients had received the money owed to them. Rentel also had entered into an agreement with his old firm for the purpose of assuring that clients from whom moneys had been misappropriated would be paid the moneys due. Further, any sanction we impose could make complete reparation a prerequisite to Rentel's practice of law. As for the injury suffered by the legal profession, this has been, in part, ameliorated by Rentel's active involvement in helping fellow alcoholics and cocaine addicts achieve recovery. Such efforts to help others reflect well on the legal profession.

The last question set forth by the ABA Sanctions Committee is a consideration of aggravating or mitigating factors. The proposal by the ABA Sanctions Committee lists 13 mitigating factors:

(a) absence of a prior disciplinary record;
(b) absence of a dishonest or selfish motive;
(c) personal or emotional problems;
(d) timely good faith effort to make restitution or to rectify consequences of misconduct;
(e) full and free disclosure to disciplinary board or cooperative attitude toward proceedings;
(f) inexperience in the practice of law;
(g) character or reputation;
(h) physical or mental disability or impairment;
(i) delay in disciplinary proceedings;
(j) interim rehabilitation;
(k) imposition of other penalties or sanctions;
(l) remorse;
(m) remoteness of prior offenses.

*Standards for Imposing Lawyer Sanctions*, Std. 9.3, at 15 (1986). In this case at least eight of the above mitigating factors are present, among them an absence of a prior disciplinary record, a timely good faith effort to rectify the consequences of the misconduct, full cooperation with the bar, physical and mental impairment, and, most importantly, *interim rehabilitation*.

The sole mitigating factor that the majority looks at is

alcoholism, stating:

> We have, on occasion, held that alcoholism is a mitigating circumstance in misappropriation cases. We emphasize here, however, that alcoholism is only a *mitigating* factor, and will only be considered as such in certain circumstances; it does not *excuse* an attorney's misconduct.

(Footnote omitted.) Majority opinion, at 286–87. The majority then discusses respondent's cocaine addiction. The majority, in effect, treats Rentel's cocaine addiction as an aggravating factor. The majority infers that the difficulty a "recovering" cocaine addict has staying off cocaine warrants the conclusion that lawyers succumbing to a cocaine addiction should be disbarred automatically. I do not believe this is the proper perspective or approach.

The majority's approach is wrong because it presents the posture that an attorney with a drug problem seeks help at his peril, since public knowledge of that problem will result in disbarment. We should encourage those members of our profession with alcohol and chemical dependencies to overcome their addictions and, accordingly, we should take rehabilitation into serious consideration when determining the appropriate disciplinary action. To do otherwise does not provide the addicted attorney incentive to do anything other than hide and prolong the damage.

The majority emphasizes that while alcohol is legal, cocaine is not. Even though this distinction is of concern, the use of cocaine is not conduct involving moral turpitude. *See In re Chase,* 299 Or. 391, 702 P.2d 1082 (1985). Further, its use is a major problem in our society that threatens all segments of the population, and the legal profession is no exception. *See Cocaine Blues,* 72 A.B.A. J. 25 (May 1, 1986). I believe we should focus on helping those who slip into the grasp of this insidious drug by encouraging solutions. We should help the members of the legal profession who have cocaine and alcohol addictions overcome their addictions and once again become contributing members of society and the profession of law.

A number of courts have given an alcoholic attorney's

efforts to rehabilitate serious consideration in determining that disbarment was not the appropriate sanction when alcoholism was a causation in the misconduct warranting the severest sanction. *See, e.g., In re Barry,* 90 N.J. 286, 447 A.2d 923 (1982); *In re Driscoll,* 85 Ill. 2d 312, 423 N.E.2d 873 (1981); *Tenner v. State Bar,* 28 Cal. 3d 202, 617 P.2d 486, 168 Cal. Rptr. 333 (1980); *In re Walker,* 254 N.W.2d 452 (S.D. 1977); *In re Lewelling,* 244 Or. 282, 417 P.2d 1019 (1966). These cases emphasize that consideration is not given the attorney because he or she is an admitted alcoholic, but rather consideration is given to a bona fide recovered or arrested alcoholic who has demonstrated his or her present fitness to continue in the practice of law. *Walker,* at 456. This same consideration should be given to chemical dependent attorneys who rehabilitate themselves and who are presently fit to practice law.

The majority cites *In re Driscoll, supra,* for the proposition that alcoholism is a mitigating factor, not an excuse. In that case the alcoholic attorney's professional conduct was so serious as to normally result in disbarment. The Illinois Supreme Court, however, was impressed by the attorney's efforts to overcome his alcoholism and his exemplary life before and after the incident charged and determined disbarment was inappropriate. The *Driscoll* court stated, at page 315:

> The legal profession and the courts have begun to acknowledge the problem presented by alcoholic, or, as they are sometimes referred to, "impaired," attorneys. We must find ways to help them and induce them to rehabilitate themselves. That problem, however, is no longer presented in this case, because respondent has already largely rehabilitated himself. And because respondent, on his own initiative, has overcome his active alcoholism and restored himself to a stable, more or less normal, condition, there is no need to keep him from practicing law during a period of temporary disability due to alcoholism. If he were now unfit to practice law, he would presumably remain so indefinitely, and the proper response to protect the public from further injury

would be to disbar him or suspend him until further order.

The majority indicates that it believes Rentel is likely to suffer a relapse because less than 20 percent of cocaine addicts stay off the drug for more than 1 year. *See Cocaine Blues,* at 26. It appears the majority has chosen to ignore the record in determining Rentel will be unlikely to sustain a remission from drug and alcohol abuse. All of the persons involved in Rentel's rehabilitation agree that the prognosis is very good. Dr. Zohn testified that "polydrug" users have just as good, and oftentimes a better chance at recovery than single drug abusers. No one can guarantee that a formerly addicted person will remain free of alcohol or drugs for the rest of his or her life. The record, however, reflects Rentel is currently free of his addictions. He has been performing in exemplary fashion in his social life and in his career, and he has taken it upon himself to help others with a similar problem. Should Rentel be allowed to resume the practice of law, nothing suggests that henceforth he will not properly discharge his professional duties to clients, the public, the legal system, and the legal profession. See majority opinion, at 282.

This case is analogous to *Driscoll.* The mitigating factors which led the Illinois Supreme Court in that case to determine suspension rather than disbarment was the appropriate sanction are present in this case. Rentel's addictions are not an excuse. However, his rehabilitation is an indication that his bad judgment will not be repeated now that his cravings are controlled. Rentel's rehabilitation is pertinent to our determination of the appropriate sanction. Given his rehabilitation, I believe there is no need to disbar Rentel and that a 15–month suspension with a probationary period is the appropriate sanction.

The majority concludes that the 10–year probationary period proposed by the hearing officer is unauthorized, would be unwieldy, and would "impose an enormous, and perhaps impossible, burden upon the bar . . ." Majority opinion, at 289. While RLD 5.2 limits "probation for a fixed

period not in excess of 2 years", there is no rule which prohibits the parties from stipulating to a longer period. In this case Rentel himself proposed the longer probationary period. I disagree that a 10–year probationary period would be unwieldy and an impossible burden. Probation is an authorized sanction and a stipulation extending the period of probation is not that onerous.

A 15–month suspension with a 10–year probationary period is also appropriate based on factors we have set forth for consideration in other attorney discipline cases. *See In re Selden,* 107 Wn.2d 246, 728 P.2d 1036 (1986); *In re Noble,* 100 Wn.2d 88, 95–96, 667 P.2d 608 (1983); *In re Kumbera,* 91 Wn.2d 401, 404, 588 P.2d 1167 (1979).

*Noble* posits the following factors: (a) the purpose of attorney discipline; (b) the proportionality of the sanction to the misconduct; (c) the effect of the sanction on the attorney; (d) whether the Board's recommendation is supported by the record developed by the hearing panel; and (e) the extent of agreement among Board members as to the sanction to be imposed. *Noble,* at 95–96.

As indicated, I believe the sanction recommended by the hearing officer adequately meets the purpose of attorney discipline. Further, while misappropriation of client funds generally warrants disbarment, this case is similar to those in which mitigating factors have resulted in a lesser sanction. *See, e.g., In re Noble, supra; In re Kumbera, supra; In re Salvesen,* 94 Wn.2d 73, 614 P.2d 1264 (1980). Alcoholism has been recognized as a very significant factor when the attorney has successfully sought and received treatment for the problem. *Noble,* at 92–93; *In re Sawyer,* 98 Wn.2d 584, 588, 656 P.2d 503 (1983); *Kumbera,* at 405.

The third *Noble* factor is the effect of the sanction on the attorney. A 15–month suspension with a 10–year probationary period is a sufficiently severe penalty. The *Noble* court stated that a 90–day suspension "reflects the serious nature of respondent's misconduct. It also recognizes, however, that respondent's transgression stemmed from a disease, rather than a deliberate and evil intent." *Noble,* at 98.

Likewise, Rentel's transgressions stemmed from a disease. Nevertheless, a severe sanction is appropriate. However, I believe that sanction should be one less devastating than the sanction of disbarment.

The fourth *Noble* factor is not met in this case. As indicated, I do not believe the Board's recommendation is supported by the facts. Finally, although the Board's recommendation was 9 to 0, I believe Rentel's rehabilitation is a specific reason warranting our rejection of the Board's recommendation. *See In re McLeod,* 104 Wn.2d 859, 865, 711 P.2d 310 (1985); *In re Stock,* 104 Wn.2d 273, 284, 704 P.2d 611 (1985).

*Kumbera* offers these factors for consideration: (a) the seriousness and circumstances of the offense; (b) avoiding repetition by the offender; (c) the sanction's likely deterrent effect on others; (d) the maintenance of respect for the honor and dignity of the legal profession; and (e) insulating those who seek legal services from unprofessional conduct. *Kumbera,* at 404.

The previous analysis indicates that the serious nature of the misconduct by Rentel would normally warrant disbarment. However, given the circumstances indicated by the record and Rentel's impressive efforts to rehabilitate himself, factors (b) and (e) are satisfied. I believe the record indicates that Rentel is unlikely to repeat his misconduct to the detriment of those seeking legal services. Further, Rentel's experience, as well as a 15–month suspension and a 10–year probationary period, will act as a significant deterrent to others. This sanction will also show those outside the legal profession that serious efforts are being made to encourage the rehabilitation of alcohol and chemical dependent attorneys. The remaining *Kumbera* factor is the maintenance of respect for the honor and dignity of the legal profession. Rentel's rehabilitation, his impressive efforts to help others, and the imposition of the severe sanction recommended by the hearing officer will help insure that respect for the honor and dignity of the legal profession is maintained.

Under the factors provided by the ABA Sanctions Committee, *Noble,* and *Kumbera,* I believe that a 15–month suspension with a 10–year probationary period is the appropriate sanction. Accordingly, for all of the reasons stated, I respectfully dissent.

DOLLIVER, C.J., and UTTER and PEARSON, JJ., concur with GOODLOE, J.