[Nos. C.D. 6454, 6628. En Banc. September 17, 1981.]

*In the Matter of the Disciplinary Proceedings Against* FRANK OLIVER WITT *and* JAMES S. WITT III, *Attorneys at Law.*

*Caroline D. Davis* and *Robert T. Farrell,* for Bar Association.

*James J. Mason,* for respondents.

BRACHTENBACH, C.J.—These attorney disciplinary proceedings involve Frank O. Witt and James S. Witt, brothers and law partners, practicing in Pierce County. In the matters here involved, respondent attorneys were acting jointly and in concert.

A 15–count complaint was filed against the Witts. After a 9–day hearing, the hearing panel officer (HPO) recommended a reprimand based upon 1 count. The remaining counts were dismissed. The Disciplinary Board, after reviewing the complete 1,341–page verbatim transcript and 118 exhibits adopted and modified the HPO's findings and concluded that a 60–day suspension was the appropriate discipline. We hold that the findings and conclusions of the Disciplinary Board are fully supported but hold that a 1–year suspension is the necessary discipline.

Respondent attorneys have been most ably represented at the hearing and before this court, but excellent representation cannot extricate them from their course of conduct which requires the increased discipline.

This matter poses a number of difficulties. The HPO found the testimony of several witnesses, including respondents' client, to be unbelievable, except where corroborated. The Disciplinary Board rejected certain findings and concluded that certain matters had been proved contrary to the findings of the HPO.

The credibility and veracity of a witness obviously are best determined by the fact finder. We have long acknowledged that in disciplinary proceedings. *In re Little,* 40 Wn.2d 421, 244 P.2d 255 (1952). However, this record is replete with documentation and evidence from other than the discredited witnesses, which led the Disciplinary Board

to its findings and conclusions and our adoption of them.

A sketch of the facts will assist in following the details. Attorneys were partners in a dairy operation with one Heinsma. A client, Paul, wanted advice on disposing of cattle which were mortgaged. Under certain circumstances, such a sale could be a state and federal crime. At least part of the proceeds of the cattle sale ended up in the attorneys–Heinsma dairy relieving the attorneys of personal liabilities. When Paul was charged with a felony in state court, attorneys represented him knowing that restitution of the encumbered funds were jeopardized by investment in a dairy in which attorneys had been partners. When it was all over, attorney's client was in jail, Heinsma was charged with a felony, their client's conviction was vacated for ineffective assistance of counsel and lawsuits, including malpractice claims, against attorneys had been settled for approximately $100,000, including contributions of approximately $26,000 from respondent attorneys.

Now to the details. On May 1, 1973, about a year before Paul became their client, attorneys entered into a written partnership agreement with Heinsma. That agreement, prepared by attorneys, consists of only four sentences, but reflects an ownership of 60 percent of the dairy in Heinsma and 20 percent in Frank O. Witt and 20 percent in James S. Witt.

Witts were more than passive investors in the dairy. It was called the Heinsma–Witt Dairy. Each Witt was authorized to borrow from the financing bank on behalf of the partnership, sign notes and mortgage assets. Each was authorized to sign partnership checks. Each gave a personal financial statement to the financing bank. Witts were personally liable to the financing bank for approximately $127,000.

In March of 1974, entered Mr. Paul, a cattle operator in Pierce County. His cattle were mortgaged to the Southwest Washington Production Credit Association (PCA). A financing statement (UCC–1) covering cattle and proceeds had been filed. Paul owed PCA about $90,000. He wanted

to dispose of his cattle, satisfy his creditors and keep some of his perceived equity. He owed his feed supplier, unsecured, approximately $25,000.

Since Paul, in the past, had diverted mortgage proceeds without accounting to PCA, he was on a weekly head count inspection. On March 17, 1974, Paul consulted with Witts. Frank O. Witt then learned that the cattle and proceeds were mortgaged, even though Paul may have made a contrary statement. The security documents were shown to Frank Witt.

A plan was developed for Paul to dispose of the cattle, withhold the proceeds from the PCA and use that as a bargaining position to get PCA and other creditors to accept less than the indebtedness in order to preserve some funds for Paul. How to handle the proceeds of sale was discussed. While there is a finding that Paul rejected Frank Witt's suggestion that the proceeds be placed in the attorneys' trust account, Frank Witt's testimony speaks for itself:

Q: Well, was there any discussion whether the money should be held in cash or put into a savings account or deposited into your trust account or place in any place? A: I didn't want it in my account. He asked me, you know, where or how should he, you know, keep care of the money and I told him, well, if he put it in an account, you know, they might attach it and that is, you know,— that is a chance you have to take. If you keep it in cash, you know, until they put you under oath and ask you where it is, there is no way, you know, they can know where it is.

On April 9, 10, and 11, 1974, Paul sold the mortgaged cattle at three different sales yards in three different counties. The proceeds of $58,350.70 were immediately converted to cash upon the advice of Frank Witt. Prior to the sales, Frank Witt and Paul discussed attorney fees. Witt requested that Paul pay a $1,500 retainer after the cattle were sold. On April 16, 1974, Paul paid Frank Witt $1,500 in cash; Frank Witt knew, or certainly should have known, that the retainer was from the cattle proceeds. He also knew that the disposition of mortgaged cattle was a felony

under RCW 9.54.010(2) and .070. Shortly thereafter Witt learned that there also was a possible violation of 18 U.S.C. § 658. In fact, part of the retainer was to cover the attorney fees for dealing with the prosecutor.

On the same date, April 16, Frank Witt and the Pauls discussed the Heinsma–Witt Dairy and the possibility of Paul's employment there. Paul knew of this relationship in the dairy; in fact, Heinsma had referred Paul to the Witts. Paul and his wife were hired by Heinsma within a few days.

Incredibly, Frank Witt told Heinsma that Paul was on his way to Moses Lake, the location of the dairy, and that he had approximately $60,000 cash. At that time the dairy was losing money and notes in a substantial amount would come due shortly. Sometime between April 16 and April 25, Paul loaned Heinsma $3,000 or $10,000, probably the latter.

When Witts learned of this loan, they told Heinsma they had to divest themselves of their interest in the dairy because of their representation of Paul. Frank Witt prepared a handwritten document. It was undated, but stated that it was "as of January 2, 1974." That was a totally false operative date. In its entirety it reads:

> Wesley G. Heinsma, first party, and Witt brothers, second party, for and in consideration of $5,000, agree as follows: Witt brothers sell and convey their interest in the Heinsma–Witt Dairy including all of its assets.

The financing bank requested something more formal and a typed agreement was prepared, reciting *inter alia* that Heinsma was to hold Witts "blameless" from any and all obligations of said dairy operation. Witts apparently never received the $5,000.

On June 15, 1974, Heinsma sold to Paul a 40 percent interest in the dairy for $55,000 cash, including the $10,000 in earlier loans. Frank Witt prepared the sales document; it is in his handwriting. Thereafter Witts received $5,000 from Heinsma to apply on a loan they had made in connection with the dairy. The source of the $5,000 is in conflict. Despite the alleged sale of all of the Witts' interest to Heinsma on April 26, on May 3 and June 11, Frank Witt

drew checks on the partnership account, on his signature alone, totaling $2,031.08, $2,000 of which went into his personal account. On May 24, 1974, almost a month after the alleged sale of the partnership interest, Frank Witt gave a financial statement to a bank, not the financing bank, and included therein under "other business connections" the following: "Dairy (net worth not included)." Heinsma paid $18,000 to the financing bank on the now overdue partnership notes and Witts were relieved of their liability to the bank.

There is a specific finding that Frank Witt encouraged and facilitated this Heinsma–Paul transaction. Yet, at the time of the sale from Heinsma to Paul, whereby Paul invested in the dairy, both Witts knew that Paul was to be charged with grand larceny for the sale of mortgaged cattle. The sale was June 15; an information against Paul had been prepared, dated June 14, by the Pierce County prosecutor.

Later the Heinsma–Paul relationship deteriorated. Again the Witts were involved. On October 12, 1974, prior to which Paul had pleaded guilty to grand larceny, it was agreed that Heinsma would repurchase Paul's interest for $55,000. The price was evidenced by a note for $10,000 payable on November 20, and a $45,000 note payable at $2,000 per month, to be paid by a milk check assignment. Witts never perfected a security interest in these proceeds or any other partnership assets. The notes were never paid. Those notes were the source of expected restitution upon which Paul's probation depended ultimately.

In October 1974, the financing bank discovered that Heinsma, now the sole owner of the dairy, had sold mortgaged cattle. The bank demanded immediate payment. He sold the remaining cattle to a third party and leased them back. Witts did not benefit from this transaction. Subsequently, Heinsma pleaded guilty to grand larceny.

On November 25, 1974, Heinsma, Paul, and the Witts met at Witts' office. Heinsma intended to abandon the dairy. Paul agreed to take over the dairy. The Witts pre-

pared documents by one of which Heinsma sold to a corporation his interest in the leased cattle. That corporation assumed specified debts. Among those assumed debts were two prior partnership obligations of attorneys of approximately $3,200 for which Witts were also responsible and which, after suit, they ultimately paid. The document also assigned the cattle lease between the third party lessor and Heinsma as the lessee. That assignment violated the cattle lease, and shortly thereafter the lessor repossessed the cattle and Paul was out of the dairy business. Witt had drawn articles of incorporation for that corporation which was the purchaser and assignee, but never perfected the corporation.

These final events made it impossible for Paul to make restitution to PCA, his probation was revoked and he was imprisoned.

We need to review other facts. On April 22, 1974, when PCA discovered that the mortgaged cattle were gone, they contacted their attorney, James Vander Stoep of Chehalis. He phoned Frank Witt to whom Mrs. Paul had referred the PCA representative. Frank Witt told Vander Stoep that the cattle were sold and that Paul had lost the money gambling in Nevada. Vander Stoep testified that his primary concern was recovery of the money. When told by Frank Witt that the money was gone, Vander Stoep called the Pierce County prosecutor, who testified that he probably would not have prosecuted if the proceeds were available for payment to the mortgagee. Even though the PCA was the mortgagee which held the solution to Paul's potential problems, Witts never contacted Vander Stoep again. During all of the events taking place in connection with the Heinsma–Witt–Paul dairy transaction, Vander Stoep never heard a single word from the Witts until he appeared at Paul's arraignment in August. Witts were talking with the attorney representing the unsecured feed supplier, but it was the secured PCA which held the key to the prosecution. Despite a willingness by the PCA to try to work out a compromise and not press prosecution, Witts simply never

dealt directly with PCA's attorney. The funds in the meantime had gone into the Moses Lake dairy operation.

It was these facts that led the Disciplinary Board to the conclusion that Frank Witt failed to make any reasonable effort to compromise or work out a program with Mr. Paul's creditors as a result of his own financial interests in the matter.

Turning now to the criminal matter, the focus is more upon James Witt. He had been a Pierce County deputy attorney, including work in the grand larceny by fraud area. He was generally aware of the criminal statute here involved and of all of the facts involved. Within a few days after the sale of the mortgaged cattle and receipt of the retainer, James Witt contacted the prosecutor's office to determine if a complaint had been filed. He was told that no complaint had been filed and even if there were a complaint, "there would be no problem as long as Mr. Paul turned the money back to PCA." Initially James Witt believed that no crime had been committed because there was some question whether a mortgage in fact existed (he never checked the records), and Paul had told him that the PCA had ordered liquidation of the cattle. When he learned that Paul had diverted proceeds in the past, that PCA had not consented to sales without immediate accounting for the proceeds, and that Paul had affirmatively represented to the sales yards that the cattle were not mortgaged, he took a different view. Yet he did not affirmatively insist that Paul give the proceeds to the PCA. He knew these facts before Paul invested in the now Heinsma dairy.

Within a few weeks after the sale of the cattle, James Witt learned of the federal statute; in his opinion Paul had no defense to the federal violation.

About June 14, the information against Paul was issued by the prosecutor's office. A substitute information was issued July 1, 1974. Arraignment was August 19. Plea bargaining had resulted in a single charge as to all proceeds, even though some of the sales took place in other counties.

Upon accepting the guilty plea the court asked "from a practical point of view, how anybody can repay such losses?" James Witt, knowing that $55,000 was invested in the dairy in which he had been a partner previously, said "It's not a question whether he can or not", it's a question of what is the amount of the restitution. Then an exchange with Vander Stoep took place, on the record, where Vander Stoep stated his understanding from Witt that the funds were available and that the status quo would be maintained while the amount of restitution was determined. The court stated that if there were no method of restitution it "would be an entirely different story."

In a written presentence report James Witt stated: "This sale [of the mortgaged cattle] took place in April and it wasn't until August that Ed Paul was convinced that he committed a crime. Therefore, he felt he had every right to spend the money any way he chose, including going to Nevada and gambling a large amount away." The statement about a large gambling loss was absolutely false. Nothing was said in that defendant's attorney's presentence report about the Witts' connection with the dairy and nothing was said about what Paul had in fact done with the money, *i.e.,* invest it in the dairy.

Before sentencing James Witt submitted an additional statement to the court as a presentence statement. He said: "Mr. Paul has spent some of the money to purchase a 40 percent working interest in a dairy farm in eastern Washington. I am personally acquainted with the dairy because at one time, prior to Mr. Paul's investment, my brother and I also held an interest in the same dairy. It would have a sufficient cash flow so that Mr. Paul could make regular payments on restitution from his interest in the dairy, notwithstanding what he can pay from his salary."

At the sentencing of his client, James Witt made these statements:

Now he has invested some of his money with the thought of providing himself with a job, but in order to insure restitution he sold his interest and has a milk check con-

signment of $2,000 a month starting in November with $10,000 downpayment. The milk check assignment is irrevocable.

Only when Mr. Vander Stoep, representing PCA, raised the question of the cattle proceeds going into the Heinsma dairy, did James Witt allude to those facts. Even then, as the findings of the Disciplinary Board indicate:

James Witt disclosed nothing to the court of his or Frank Witt's involvement in the cattle sales or of the application of the sale proceeds to their personal benefit. These facts, if known, would have been critical in the court's sentencing decision.

Probation was granted upon condition of a $10,000 payment in November and monthly payments thereafter. When Paul failed to make the $10,000 payment due in November, a revocation hearing was held. James Witt represented that Heinsma might have made off with the $10,000. No disclosure of Witts' involvement was made. No disclosure of Paul's takeover, through a legally nonexistent corporation, of the dairy was made. No disclosure of the assumption of Witts' debts was made. The reason for the use of a corporation, though never legally existent, becomes clear because a condition of probation was that Paul was not to make any purchase on an installment contract or enter into any mortgage obligation above $500 without the prior approval of his probation officer.

At the revocation hearing, Paul testified about the investment in the dairy. He claimed that he and Heinsma had drawn all the papers except that James Witt might have helped on the last one (whatever that meant). James Witt never volunteered the facts about the Witts' intimate involvement in those transactions or their part in preparing the documents. The court continued the revocation hearing. When it came back on for hearing in May of 1975, Paul had lost all the cattle, Heinsma was awaiting sentencing, Paul had another attorney, and the Witts were represented by an attorney.

Probation was revoked, Paul sentenced to 15 years, sus-

pended on condition of serving 6 months in the county jail.

The essence of respondents' objections is that the Disciplinary Board substituted its judgment as to witness credibility for that of the hearing panel officer. We do not believe that the Disciplinary Board did that. After repeated readings of the testimony and the exhibits, it is our belief that the foregoing recital of events is supported by the record even without the discredited testimony.

Nothing will be gained by a point by point analysis of the 11 challenges made by the respondents. Instead, one example will suffice to illustrate the support in the record for the findings and conclusions of the Disciplinary Board and our acceptance thereof. Respondents allege that the Disciplinary Board erroneously found that Frank O. Witt "actively encouraged and facilitated" the Pauls' June purchase of an interest in the dairy. Respondents contend that to so find the Disciplinary Board accepted the testimony of the Pauls, rejected that of respondents, and embellished the Pauls' testimony with a finding totally unsupported in the record. One can ignore completely the Pauls' testimony and find that Frank Witt was actively involved in the transaction. From Frank Witt's own testimony we learn: (1) in April he told Heinsma that Paul had the cattle proceeds; (2) before Paul bought into the dairy he knew that Paul faced possible criminal charges; (3) that the problem could be solved without a criminal charge if PCA could be satisfied; (4) that he knew the money going into the dairy was from the mortgaged cattle; (5) that before Paul invested he and the Pauls and possibly Heinsma discussed the matter; (6) that he probably told Paul he could do well in the dairy; (7) that he did not advise Paul to not put the cattle proceeds into the dairy; and (8) that the transfer document from Heinsma to Paul was in Frank Witt's own handwriting. This testimony from Frank Witt himself and the exhibits fully support the Disciplinary Board's findings; the same thing is true of the testimony which supports the other findings and conclusions of the Disciplinary Board.

The HPO found a violation on one count. The Disciplin-

ary Board found violations on two additional counts. Witts herein ask for reinstatement of the single violation found by the HPO, relief from all costs and an award of costs and attorney fees against the Bar.

The count on which the HPO and the Board were in substantial agreement involved violations of (CPR) DR 5–101(A) (the pleadings refer to DR 5–102–(a), an obvious error). That rule provides:

> Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests.

The violations are so apparent no explanation is needed beyond stating the foregoing facts.

The Disciplinary Board found a violation of (CPR) DR 5–103(A), which prohibits a lawyer from acquiring a proprietary interest in the cause or subject matter of litigation. This violation was based on use of the mortgaged cattle proceeds to discharge dairy debts on which Witts had personal liability and acceptance of payments from the dairy account after the cattle proceeds were commingled with the dairy assets and from the Witts' knowing acceptance of their fee from the cattle proceeds. This finding is supported.

The next transgression involves (CPR) DR 7–102(A)(3). A lawyer shall not conceal or knowingly fail to disclose that which he is required by law to reveal. The Disciplinary Board based this finding upon James Witt's concealment and nondisclosure at the arraignment, sentencing and revocation hearings.

We agree. The conduct of James Witt in this regard was reprehensible. Witt not only represented that there was no question of Paul's ability to make restitution but failed to disclose that the funds to be paid to the PCA had been invested in a dairy that was losing money, the only assets of which were mortgaged and that Witts had escaped further personal liability by application of the proceeds to the bank

debt.

Judges, of necessity, rely upon the integrity and candor of lawyers appearing before them. James Witt's clear violation of this elementary standard was not only a fraud upon a very conscientious trial judge, but placed his client in a position where probation revocation was highly probable and in fact did occur.

We have given careful consideration and weight to the findings and conclusions of the hearing panel officer and the Disciplinary Board. We have attempted to avoid any substitution of our evaluation of the credibility of witnesses for that of the hearing panel officer. We have focused upon the exhibits and the testimony of the Witts themselves and witnesses whose credibility was not challenged. As we have often said, the ultimate measure of discipline rests solely with this court. It is our considered judgment that the minimum discipline warranted is a suspension from the practice of law for 1 year.

The Witts' claim of attorney fees and costs is denied. The Bar Association has not claimed costs so none are awarded.

ROSELLINI, STAFFORD, UTTER, DOLLIVER, HICKS, WILLIAMS, DORE, and DIMMICK, JJ., concur.