[No. C.D. 13316. En Banc. November 26, 1986.]

*In the Matter of the Disciplinary Proceeding Against* JAMES P. SELDEN, *an Attorney at Law.*

*Robert T. Farrell* and *Lydia Gold,* for Bar Association.

*Richard J. Jensen* and *Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim,* by *James E. Horne,* for respondent.

ANDERSEN, J.—

## FACTS OF CASE

At issue here is the appropriate sanction for a lawyer who misappropriated funds from his law firm.

Respondent James P. Selden graduated from law school in 1980 and was admitted to the bar later that year. While in law school, and for a year thereafter, he worked for a title insurance company in Tacoma. On December 1, 1981, he left the company for employment as an associate with the Tacoma law firm of Betzendorfer, Deutscher and Granoski. Respondent's starting salary was $2,000 a month, which was what he had earned at the title company. Respondent had a number of debts at the time, and testified that Charles Granoski knew of those debts and that both Granoski and Joseph Betzendorfer promised him a bonus as an incentive to leave the title company. The two partners denied that they ever promised respondent a bonus, and nothing about any claimed right to a bonus was ever put into writing.

Respondent handled considerable business for the law firm during his first year. On December 1, 1982 he presented a report covering his first year at the firm in which he requested a salary increase of $1,000/month but made no mention of any bonus. Nor did he claim that any of the clients he had assisted were his, rather than the firm's, clients. The firm gave respondent the full $1,000/month raise he requested.

The law firm handled payments by clients as follows. When a check came through the mail, a secretary noted the payment on the client's ledger card and on the general account ledger or the trust account ledger. If the check were intended for the general account, the secretary endorsed it with the firm's stamp. If the check were made out to an individual attorney, that attorney endorsed it and the secretary then added the firm's stamp.

In the spring of 1983, the respondent began keeping some of the checks that were made payable to him. He took the checks at a time when resources at the firm were limited

because two of the three partners were ill and unable to maintain regular work schedules. Respondent had recently divorced and had a number of resulting debts. From April until October 1983, he deposited approximately 30 checks from 20 clients in his own bank account. He took no client trust funds.

The firm learned that some of its funds were missing when some clients protested being billed twice. When confronted by the firm on November 10, 1983, the respondent at first tried to bluff but finally admitted taking some money. He called one of the partners that evening and said that he had taken about $2,000.

The firm began to check its records and found that some client ledger cards were missing. Respondent, who had taken the cards home, returned them. The firm also found that other client ledger cards had entries showing payment where respondent had admitted taking those payments. He denied making those entries, but later testified that he had told his secretary that certain bills were paid when he had actually kept those payments.

The firm requested the respondent's bank records and finally turned the matter over to the bar association. Respondent did not give his records to the firm, but he did eventually provide them to the bar association in response to a subpoena. After the bar association calculated that respondent had taken $6,810.40, he repaid the firm in full, after which the firm decided not to press criminal charges. The firm fired the respondent, however, and he was then hired by another Tacoma law firm. The respondent deposited the final check belonging to the law firm in his own account on November 21, 1983, which was after his misappropriations had been discovered and after he had been fired.

The bar association filed a formal complaint against the respondent on April 25, 1984, charging him with misappropriating funds and also with misrepresenting the extent of his misappropriations. A hearing was held on April 24, 1985. Bar counsel argued for disbarment, while respon-

dent's attorney argued for dismissal of the complaint or, at most, a letter of censure or public reprimand. Respondent asserted then, as he still does, that he took only payments made by clients for whom he had done work and only because he deserved and had been promised a bonus. He added, however, that he knew what he had done was wrong, and said that it would not happen again. His psychiatrist, whom the respondent consulted eight times in 1984 and 1985, said that he had been rehabilitated.

The hearing officer did not accept the bonus rationalization, and recognized that respondent had violated several disciplinary rules. In his decision, however, he referred to what he termed mitigating factors, including respondent's rehabilitation. The officer recommended a 60–day suspension and assessed costs and restitution against respondent. The Disciplinary Board reopened the record to admit 11 letters of recommendation from attorneys and clients on respondent's behalf, but adopted the hearing officer's findings, conclusions and recommendations. One Board member abstained; two others dissented, urging that the respondent be suspended for 120 days.

Respondent filed a notice of appeal from his suspension in this court.[1] The bar association, in turn, sought discretionary review of the Board's decision,[2] asking for a more severe sanction. We granted the bar's request for discretionary review[3] and joined it for hearing with respondent's appeal.

One ultimate issue is presented.

## ISSUE

What is the appropriate sanction for an associate who misappropriates $6,810.40 in funds belonging to his law firm?

---

[1] RLD 7.2(a).

[2] RLD 7.3(a).

[3] State bar counsel sought discretionary review in this case pursuant to authorization of the Board of Governors.

DECISION

CONCLUSION. The months long course of respondent's repeated thefts from his employer, together with his efforts to conceal the extent of his defalcation, require that respondent be disbarred from the practice of law in this state.

Respondent initially challenges several of the hearing officer's findings and conclusions. Specifically, he challenges the findings that no bonus was promised, that he intended to deprive the firm of its funds, that he caused entries to be made on some ledger cards that indicated payment, and that he provided his bank account records only after they were subpoenaed. He also challenges the conclusions that he violated three disciplinary rules.

■ We have consistently held that we will not disturb factual findings made by a hearing officer upon conflicting evidence.[4] The credibility and veracity of witnesses are best determined by the fact finder before whom the witnesses appear and testify.[5]

There was considerable testimony at the hearing regarding the bonus that the respondent claimed he expected. Two partners in the firm testified, however, that no bonus other than the firm's somewhat nominal Christmas bonus given to all employees was ever promised to the respondent. The hearing officer observed the witnesses, listened to their conflicting testimony and concluded that no bonus had been promised. That finding is well substantiated by the record and we will not disturb it. For that same reason, we will not alter the remaining findings of fact. Respondent's attempts to conceal his taking of money that did not belong to him makes the finding that he intended to deprive the law firm of those funds eminently reasonable. It also appears very likely that his responses to his secretary's inquiries to the effect that some bills had been paid was

[4]*In re Denend*, 98 Wn.2d 699, 704, 657 P.2d 1379 (1983); *In re Little*, 40 Wn.2d 421, 427, 244 P.2d 255 (1952).

[5]*In re Kuvara*, 97 Wn.2d 743, 747, 649 P.2d 834 (1982); *In re Witt*, 96 Wn.2d 56, 57, 633 P.2d 880 (1981).

what led her to make payment entries on certain ledger cards when, in fact, respondent had kept the money. Finally, regardless of motive, respondent did not relinquish his bank records until they were subpoenaed. We sustain the hearing officer's findings.

Respondent also challenges the hearing officer's conclusions that he violated certain disciplinary rules. These challenges must fail if the challenged conclusions of law are supported by the findings of fact.[6]

Here, the finding that respondent misappropriated his firm's funds supports the conclusion that he violated CPR DR 1–102(A)(3), prohibiting a lawyer from engaging in illegal conduct involving moral turpitude.[7] That finding also supports the conclusions that respondent violated CPR DR 1–102(A)(4), prohibiting a lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation, as well as CPR DR 1–102(A)(6), prohibiting a lawyer from engaging in conduct that adversely reflects on his ability to practice law. The hearing officer also concluded that respondent's conduct in misrepresenting the extent of his wrongdoing to the firm, removing client ledger cards from the firm, and causing some cards to be altered, again violated CPR DR 1–102(A)(4). These conclusions are fully supported by the findings of fact and will be sustained.

■■ The issue thus becomes what sanction is appropriate. The ultimate responsibility for determining the nature of lawyer discipline rests with this court, not the Disciplinary Board.[8] We do, however, give serious consideration to Disciplinary Board recommendations.[9] We will ordinarily affirm the sanction recommended by the Disci-

---

[6]*Denend*, at 705.

[7]*See In re Saulnier*, 97 Wn.2d 676, 677, 648 P.2d 433 (1982); *In re Anderson*, 73 Wn.2d 587, 588, 439 P.2d 981 (1968).

[8]*In re Noble*, 100 Wn.2d 88, 95, 667 P.2d 608 (1983); *In re Espedal*, 82 Wn.2d 834, 838, 514 P.2d 518 (1973).

[9]*Noble*, at 94; *In re Nelson*, 87 Wn.2d 77, 80–81, 549 P.2d 21 (1976).

plinary Board unless we can articulate specific reasons for adopting a different sanction.[10]

In *In re Noble*, 100 Wn.2d 88, 95, 667 P.2d 608 (1983), this court set forth a number of factors to be considered in evaluating the Board's recommendations. One consideration should be the purposes of attorney discipline. The purpose of disciplining an attorney is not primarily to punish the wrongdoer, but to curb disrespect for the profession, to maintain its honor and dignity, and to assure those who seek the services of an attorney that conduct involving dishonesty and lawlessness will not be tolerated.[11] The public's confidence in the legal profession must be preserved and attorneys must be deterred from engaging in similar misconduct.[12] In satisfying these objectives, the consequence of an attorney discipline case is to some extent unavoidably punitive.[13]

The Board's recommendation will be modified where we deem it insufficient to achieve the purposes of attorney discipline set forth above.[14]

We have grave doubts about the deterrent effect of a 60–day suspension for a sustained course of thievery resulting in a loss of $6,800. Even more important is the issue of whether a 60–day suspension will preserve confidence in the legal profession. Respondent stole 30 checks from his law firm from April to November, thus engaging in dishonest conduct over an 8–month period. He also took client ledgers home with him. The law firm partners had to explain to clients why they fired the respondent, and his present clients will be told why this court finds disciplinary action

---

[10]*Noble,* at 95; *In re McLeod,* 104 Wn.2d 859, 865, 711 P.2d 310 (1985).

[11]*In re Greiner,* 61 Wn.2d 306, 313, 378 P.2d 456 (1963); *In re Case,* 59 Wn.2d 181, 184, 367 P.2d 121 (1961).

[12]*See Noble,* at 95; *In re Salvesen,* 94 Wn.2d 73, 76, 614 P.2d 1264 (1980).

[13]*Little,* at 430.

[14]*See Noble,* at 95; *In re Durham,* 41 Wn.2d 609, 612–13, 251 P.2d 169 (1952).

necessary.[15] Such revelations reflect poorly, to say the least, upon the legal profession. In view of these considerations, a suspension is in our opinion patently inadequate to curb disrespect for the profession, to maintain its integrity and to assure potential clients that dishonesty and lawlessness by members of the bar will not be tolerated.

We have repeatedly emphasized that the appropriateness of a sanction is to be based on the particular facts of each case.[16] Such facts are revealed when a second factor is considered: whether the sanction recommended by the Board is proportionate to the misconduct. Aggravating and mitigating factors are evaluated here, as are sanctions imposed in factually similar cases.[17]

The respondent argues that *In re Rice,* 99 Wn.2d 275, 661 P.2d 591 (1983) is factually similar. We disagree. In *Rice,* the Board recommended a 6–month suspension of a partner who allegedly misappropriated partnership fees.[18] This court decided against imposing any sanction for several reasons.[19] The court also noted among its "relevant concerns" that which primarily distinguishes *Rice* from this case: there was no finding Rice intended to permanently deprive the law firm of the disputed funds (in fact the evidence was to the contrary), and his behavior was not out of character with that law firm's loose accounting procedures.[20] The *Rice* court also held that it would "under no circumstances . . . involve itself in intrapartnership accounting disputes."[21] We now add emphasis to this

---

[15]*See* RLD 8.1(a).

[16]*Nelson,* at 81; *In re Livesey,* 85 Wn.2d 189, 193, 532 P.2d 274 (1975).

[17]*Noble,* at 95.

[18]*In re Rice,* 99 Wn.2d 275, 277, 661 P.2d 591 (1983).

[19]*Rice,* at 277–78.

[20]*Rice,* at 279.

[21]*Rice,* at 279.

aspect of *Rice*: it stands for the proposition that *when there has been no finding of fraud,* this court will not entertain an accounting action in the guise of a disciplinary proceeding.

*Rice* is not applicable where, as here, an associate helps himself to law firm funds to which the associate is not entitled.[22] Contrary to respondent's assertions, the clients whose payments he stole were *not* his clients. Respondent was an associate and the clients he worked for were the firm's clients. To characterize extensive and repeated thefts from that firm, misstatement of the amount taken and concealment of client ledgers as no more than an "intra-partnership accounting dispute" is an affront to the profession and its disciplinary procedures.

As noted in *Rice,* disbarment is the usual sanction for an attorney who misappropriates a client's funds.[23] We have in the past relied on mitigating factors to justify a lesser sanction than might otherwise have been imposed.[24] In the case at bar, the hearing officer and members of the Disciplinary Board recognized several mitigating factors: respondent had not previously been the subject of disciplinary proceedings; his record was good apart from April–December 1983; he was at the time under emotional and financial pressure centered around the dissolution of his marriage; he said he realized he had done wrong; he is now working for a law firm that gives him a high recommendation; he sought and received psychiatric treatment; and once the bar investigation had commenced, he cooperated with it.

We are not impressed by several of those factors. Many attorneys go through the stress of divorce without

---

[22]Respondent implies that, under *Rice,* a partner may take funds from his or her firm with no danger of retribution. Since the case before us does not involve a partner taking funds from a law firm in which he or she is a partner, we do not further address that aspect of the issue.

[23]*See, e.g., In re Denend; In re Cary,* 90 Wn.2d 762, 585 P.2d 1161 (1978).

[24]*See Salvesen,* at 77–79; *In re Kumbera,* 91 Wn.2d 401, 405, 588 P.2d 1167 (1979).

stealing from their law firms. An attorney's recognition that theft is wrong and his cooperation with a bar investigation do not merit great commendation. Indeed, we conclude that the aggravating factors present in this case are much more compelling than any of the mitigating factors listed by the Board. When the respondent did not receive the bonus he says he expected, he took the money in 30 separate installments over an 8–month period, covered up the takings and did not disclose his wrongdoing despite a number of opportunities to do so. He did this during a period of time when two of the partners suffered illnesses and the firm was shorthanded and vulnerable. When respondent was finally confronted with evidence of his thefts, he initially denied the takings, then later underestimated the amount he had taken by $4,800. Incredibly, he then stole yet additional funds after his firm discovered his misappropriations and fired him. We note here that this court imposed a 2–year suspension on an attorney who shoplifted $300 worth of merchandise in the course of 1 hour.[25] To order a 60–day suspension of an attorney who stole $6,800 over an 8–month period, and then went to considerable effort to cover up his theft, would be grossly disproportionate to sanctions imposed in previous cases and would make a mockery of the goals of attorney discipline[26]

It is the conclusion of a majority of this court that it is necessary to disbar the respondent to protect the integrity of the legal profession and preserve the public's confidence in it.

The respondent, James P. Selden, is hereby disbarred from the practice of law in the State of Washington.

DURHAM, J., and JAMES, J. Pro Tem., concur.

DORE, J. (concurring)—The majority correctly concludes that the conduct of James Selden warrants disbarment. I

---

[25]*In re Saulnier*, 97 Wn.2d 676, 677, 648 P.2d 433 (1982).

[26]*See, e.g., In re Saulnier; In re Rosellini*, 97 Wn.2d 373, 646 P.2d 122 (1982).

agree. Because our past pronouncements have caused a great deal of confusion, however, I have set forth my views as to what standards should be used for attorney discipline.

### STANDARDS FOR ATTORNEY DISCIPLINE

The Supreme Court of Washington has exclusive responsibility to determine whether a lawyer's misconduct warrants disbarment. Rules for Lawyer Discipline 2.1; *In re McGlothlen,* 99 Wn.2d 515, 663 P.2d 1330 (1983); *In re Espedal,* 82 Wn.2d 834, 514 P.2d 518 (1973). Nevertheless, in *In re Noble,* 100 Wn.2d 88, 95, 667 P.2d 608 (1983), a majority of this court stated that "we will adopt the sanction recommended by the Disciplinary Board unless we are able to articulate specific reasons for adopting a different sanction." This standard is explicitly approved in the majority opinion at page 253. I believe this statement abdicates our constitutional responsibility. In my opinion we should not give such deference to the Board.

Historically, this court has stated that the primary purpose of attorney discipline cases is to protect the public and preserve confidence in the legal profession and judicial system. *In re Noble, supra; In re Salvesen,* 94 Wn.2d 73, 614 P.2d 1264 (1980); *In re Smith,* 83 Wn.2d 659, 521 P.2d 212 (1974); *In re Steinberg,* 44 Wn.2d 707, 269 P.2d 970 (1954). Over the years this court developed a test considering: (1) the seriousness and circumstances of the offense, (2) avoidance of repetition by the offender, (3) the sanction's likely deterrent effect upon others, (4) maintenance of respect for the honor and dignity of the legal profession and (5) assurance that those who seek legal services will be insulated from unprofessional conduct. *In re Kumbera,* 91 Wn.2d 401, 588 P.2d 1167 (1979); *In re Smith, supra.* These considerations accurately enable us to decide the proper sanction which would fulfill the goal of protecting the public and preserving confidence in the legal system. The considerations take into account the aggravating and mitigating factors of the particular case, carefully tailoring the disciplinary sanction to the violations of the attorney in ques-

tion.

Recently, however, in *In re Noble* and its progeny, we have strayed from the beaten path. *Noble* sets forth five different factors to be considered when we set the appropriate disciplinary sanction: (1) the purpose of attorney discipline, (2) proportionality to the misconduct, (3) the hardship on the attorney, (4) the Board's recommendation, and (5) the unanimity of the Board in deciding the recommendation. *Noble*, at 95–96. The new factors have, in my opinion, reduced the effectiveness of attorney discipline. While the purpose of attorney discipline remains the same, to protect the public and to maintain confidence in the legal profession, this court now considers this as only one of five factors in determining the appropriate sanction. As a result, this court now gives more weight to the Board's recommendation and the hardship to the offending attorney, than to the principal purpose of protecting the public and assuring the integrity of the legal system.

## The Kumbera Approach

I believe this court should return to the five considerations described in *Kumbera* because they better fulfill the purpose of attorney discipline. When analyzing these factors in relation to the acts committed by the respondent, I believe the only result this court could reach would be disbarment.

1. The Seriousness and Circumstances of the Offense. Respondent committed approximately 30 counts of theft against his employers. The respondent argues that he should not be disciplined because our decision in *In re Rice*, 99 Wn.2d 275, 277, 661 P.2d 591 (1983) controls. I agree with the majority that *Rice* is not applicable. Unlike Rice respondent purposefully stole money from his partners at a time when two of the partners were seriously ill. He justified his actions stating he had a right to a bonus, when no evidence of a promise of a bonus existed, and soon after he had received a $12,000 per year raise.

Although this case does not involve theft of a client's

trust funds, I believe the distinction between theft of client's funds and theft of an employer's funds is minimal. Clients often entrust lawyers with large amounts of money, and these clients deserve and expect trustworthy lawyers. A lawyer who steals, regardless of whether it is from his clients or the firm, places this trust in jeopardy and cannot be allowed to continue practicing law. We have emphasized this point time and time again, *In re Stock*, 104 Wn.2d 273, 704 P.2d 611 (1985); *In re Moynihan*, 97 Wn.2d 237, 643 P.2d 439 (1982) and have suspended an attorney for 2 years for shoplifting merchandise worth $300 in 1 hour. *In re Saulnier*, 97 Wn.2d 676, 648 P.2d 433 (1982). Theft by an attorney simply cannot be countenanced, and ordinarily warrants disbarment in all but the most extraordinary circumstances.

2. Avoidance of Repetition by the Offender. The hearing officer found that it was unlikely that the respondent would ever commit these acts again. While I accept this determination, I cannot help but discount its weight. Any person who can to this day continue to justify 30 counts of theft by an unfounded claim to a bonus must have the potential to convince himself sometime in the future that he is entitled to steal someone else's funds for another spurious reason.

3. The Sanction's Likely Deterrent Effect Upon Others. This case is one of first impression before this court. While we have followed a general rule that stealing from clients warrants disbarment, we have not addressed the question of the appropriate sanction for stealing from an attorney's employer. To give a more lenient sanction to this type of theft would only serve to encourage theft from an employer rather than a client. It would give the impression that certain types of theft are acceptable. All thefts are reprehensible and, absent extraordinary mitigating factors, warrant disbarment.

4. Maintenance of Respect for the Honor and Dignity of the Legal Profession. The legal profession requires trustworthy and honest professionals. Respondent stole repeatedly for 8 months, including the theft of one check after he

was caught. He attempted to cover up the extent of the thefts by removing some ledger cards. He stole when two of the partners were seriously ill and particularly vulnerable. To allow such an individual to practice law in this state sends a clear message to the public that the bar tolerates certain types of thievery. We should not tolerate such conduct. It is beneath the dignity of the profession to allow respondent to remain a member of the bar.

5. Assurance That Those Who Seek Legal Services Will Be Insulated From Unprofessional Conduct. The final question each Justice of this court must consider is:

> "Can I, in view of what has been clearly shown as to this man's conduct, conscientiously participate in continuing to hold him out to the public as worthy of that confidence which a client is compelled to repose in his attorney?"

*In re Cary,* 90 Wn.2d 762, 767, 585 P.2d 1161 (1978); *In re Beakley,* 6 Wn.2d 410, 107 P.2d 1097 (1940). I cannot.

I concur with the majority's decision to disbar.

GOODLOE, J., concurs with DORE, J.

UTTER, J. (dissenting)—I do not agree with the majority that James P. Selden should be disbarred. While I concur in the majority's comments regarding the grievous nature of Mr. Selden's misconduct, I cannot agree with the recommended disbarment. By this court's action, we completely disregard the conclusions of the hearing officer who heard the live testimony of the witnesses and Mr. Selden and who is in the best position to conclude what petitioner's future conduct will be. We also totally disregard the conclusions of the entire Disciplinary Board of the bar association whose lawyers and lay members we may assume share the same concerns we have in disciplinary cases.

The hearing officer's concluding paragraph furnishes this court an insight into the reasons for his recommendation. He stated:

Mr. Selden sought and received professional psychiatric counselling. His doctor is certain he is rehabilitated. He cooperated with the Bar Association's investigation and there is no evidence of misuse of client funds. After watching him testify and his demeanor throughout the hearing, I believe that Mr. Selden will not violate the Rules for Lawyer Discipline again. However, the rules have been violated and a severe sanction is required. Therefore I recommend a suspension for a period of sixty days, restitution, and costs assessed against Mr. Selden as the appropriate sanction in this case.

Findings, Conclusions, and Decision, at 4. A review by the chairperson of the bar association Disciplinary Board ordered that the hearing officer's recommendation that the respondent be suspended from practice for a period of 60 days be adopted. The dissenting opinion, signed by two members of the Disciplinary Board, one a nonlawyer, recommended instead a 120–day suspension. That opinion noted:

Mr. Selden's conduct is seriously at fault. He argues that he knows he was wrong and is remorseful. While the feeling of remorse is appropriate, it is not sufficiently mitigating for the dissenting members to consider a less severe sanction. As a deterrent to others, himself, and as a message to the public that members of the Bar will not tolerate a taint on the honor, dignity, and integrity of the legal profession, we feel a suspension of at least 120 days is appropriate.

Disciplinary Board dissenting opinion, at 1–2.

I subscribe fully to the majority's concern that the purpose of disciplining an attorney is not primarily to punish the wrongdoer, but to curb disrespect for the profession, to maintain its honor and dignity and to assure to those who seek services of an attorney that conduct involving dishonesty and lawlessness will not be tolerated. The majority further recognizes the public's confidence in the legal profession must be preserved and attorneys must be deterred from engaging in similar misconduct and that in satisfying these objectives the consequence for attorney discipline cases is to some extent unavoidably punitive.

An examination of the carefully considered opinions reached by the hearing officer and the Disciplinary Board leads to the inescapable conclusion that they were motivated by exactly the same factors that motivate this court in reaching their conclusions. They had before them for consideration all the cases relied upon by the majority. Suspension of an attorney for a period of 60 days or more is a severe sanction. It requires an attorney to notify all clients of the suspension, its basis, and the attorney's consequent inability to act for them. Clients involved in litigation or administrative proceedings must be further notified of their need to seek prompt substitution of another attorney. If such a client does not seek other counsel, an attorney must also notify the court or agency before whom the client is appearing of the attorney's inability to act. RLD 8.1 requires other specific acts of the attorney, as well.

To say this action does not deter attorneys from similar misconduct or convey to the public a message that dishonesty and lawlessness will not be tolerated is to unnecessarily ignore the broad diversity of background of those who made the recommendations to this court. The attorneys on the Disciplinary Board represent a broad cross section of citizens from various geographic areas of this state. In addition, this court has by its rules added lay members to the Disciplinary Board to assure recommendations will not suffer from an insulated view of the effect of disciplinary recommendations on the public.

The reasons cited in the majority and dissenting opinions of the Disciplinary Board give adequate reasons why their opinions should be considered and given greater weight. I therefore dissent.

DOLLIVER, C.J., PEARSON, J., and BEVER, J. Pro Tem., concur with UTTER, J.

Reconsideration denied March 6, 1987.