*In the Matter of the Disciplinary Proceeding
Against* VICTOR J. FELICE, *an
Attorney at Law.*

*Maria S. Regimbal,* for Bar Association.

*Victor J. Felice,* pro se.

DORE, J.—This disciplinary matter comes before the court upon its own initiative. Rules for Lawyer Discipline (RLD) 7.1(b). The hearing panel officer recommended a reprimand and a 30–day suspension for Victor Felice's misconduct while acting as guardian of Verna Cambern. The Washington State Bar's Disciplinary Board unanimously

recommended only a letter of censure. We hold a letter of censure and a 30–day suspension to be the appropriate sanctions.

## FACTS

In the early 1970's, Felice represented a Mr. Kreck in his prosecution and unsuccessful appeals for the murder of his wife. In 1979, Felice successfully filed a petition for a writ of habeas corpus on Kreck's behalf in federal court in Spokane. Exhibit 3. Prior to Kreck's release from Walla Walla, he was sent to Eastern State Hospital for a mental evaluation. The evaluation concluded that "Kreck continues to suffer from Schizophrenia, Paranoid Type, in partial remission." The evaluation further opined that "Kreck is safe to be at large" so long as he "immediately make[s] contact with the Community Mental Health Center . . . for whatever outpatient evaluation and contacts that may be recommended." Bar exhibit 5. Kreck was released into the custody of Felice.

Shortly after his release from prison, Kreck moved to Spokane where he periodically stayed with his longtime friend Verna Cambern. Mrs. Cambern was an 86–year–old widow without children, who was living alone in her rooming house. She had in previous years cared for Kreck's two children. He was grateful for her help and treated her as he would have treated his own mother. Kreck performed a number of chores around Verna's house, providing transportation for Verna to attend church services, to the grocery store, the hair dresser and recreational drives.

Cambern visited her niece Dorothy Ryder in Portland. At the request of Cambern, Ryder agreed to come up to Spokane with her family to care for Mrs. Cambern. Bar exhibit 1, at 26. In time Cambern agreed to change her will and leave all her estate to Ryder. Felice then drew up the new will in the spring of 1981.

In early June 1981, Felice drew a power of attorney on behalf of Verna Cambern naming Dorothy Ryder as Verna Cambern's attorney in fact. Later, Cambern quitclaimed

her real property over to Dorothy Ryder and retained a life estate. She also requested Ryder to cash a number of her bonds. According to Charlie Beck, Verna's brother, the family was aware of these arrangements and it was agreed that the property would go to Dorothy Ryder for taking care of Verna for the rest of her life.

Kreck had different perceptions, however, of what was happening with respect to Verna Cambern and her property. Kreck informed Felice that he had overheard the son of Ryder stating that if Verna came up the stairs, they could push her down and everything would be theirs.

Because of the allegations of Kreck that Verna Cambern's life was in danger and that people were taking all of her money, Felice felt it was necessary to bring an emergency guardianship hearing in order to seek return of Cambern's home and securities.

On September 4, 1981, Felice prepared the petition for guardianship and attached to the petition a medical report declaring Verna Cambern's incompetency. In the petition, he did not list the names of any of Verna Cambern's family, but stated that Verna had two disinterested brothers living in the area. Felice did not petition the court to name a guardian ad litem. On September 9, 1981, the court appointed Felice guardian of the person and property of Cambern. Bar exhibit 1, at 10–11. Throughout this petition for guardianship, Felice did not give the Ryders or any other relatives any notice of the action he was taking. Charles Kreck removed Verna from her home on August 27, 1981. Bar exhibit 1, at 25–29.

Cambern continued to stay in the custody of Charles Kreck after Felice was appointed guardian. Kreck took Cambern down to Portland over Felice's objection and he refused to bring her back to Spokane. Bar exhibit 3, at 468–69. Felice failed to investigate the then current status of Kreck's "chronic paranoid schizophrenia in partial remission" or his ability to attend the constant needs of Cambern. At no time did Felice personally go to Portland to investigate the conditions in which Cambern was living.

In October 1981, Felice received disturbing details of Verna Cambern's current living conditions. He received the following letter from the Oregon Department of Human Services.

The PACT Senior Center called me on 10/16/81. They referred Mrs. Cambern to me stating that she needed some help.

I did a home assessment on that date, and found Mrs. Cambern standing in her front yard. She was very shaky and somewhat unsteady on her feet. We went into the house and there were several boxes packed and stacked all over the house, and it was very cold. Mrs. Cambern told me that she hadn't eaten for several days. The refrigerator had food in it but most of it was spoiled. She said that it was not her food and that it belonged to Mr. Kreck. She said she had been helping with cooking etc. in exchange for free rent. She said that she had only been here a short while, and when I asked where she came here from, she replied she did not know.

I went to the store and brought back some food. When I returned, there were three young men on the porch who said they had been asked to check on Mrs. Cambern by yourself. I got your phone number and address from them.

Mrs. Cambern ate ravenously and stated that she felt better but was still unable to give me much information. I then returned to my office and called you.

Bar exhibit 17. Felice responded to this report by making some phone calls. He also made some unsuccessful attempts to line up an independent third party to come in on a weekly basis to check on Cambern. He did not go down to Portland; and he totally failed to take any steps to bring Cambern back to Spokane to put her in a nursing home or to make other living arrangements for her in the event she desired to stay in Portland.

In November 1981, around Thanksgiving, Kreck again left Cambern alone for several days. In early December 1981, the family located Cambern when a grandniece and a close family friend went to Kreck's residence in Portland with a local sheriff. They found Cambern alone, in a cold, dirty house with no edible food. Cambern was cold, dirty,

and very pale with bruises up and down her arms. Cambern agreed to leave with them. They took her home with them to the Dalles, Oregon. Cambern was then taken to the hospital. She was diagnosed as having congestive heart condition and pernicious anemia. Subsequently, she was brought back to Spokane by her grandniece and was admitted into a nursing home.

During November 1981, the Ryders filed a motion for appointment of a guardian ad litem on behalf of Cambern, and David Henault was appointed. Bar exhibit 1, at 64. This order required Felice, as guardian, to consult with Henault before taking any further action in the Cambern guardianship. Bar exhibit 1, at 85–86.

In the middle of January 1982, members of Verna Cambern's family asked Felice to step down as guardian. Felice refused unless his $3,500 attorney and guardianship fees were paid. The family believed the fees that Felice was asking for were outrageous and refused to sign the guardianship papers.

On April 2, 1982, Felice presented an ex parte order to the court authorizing among other things the payment to himself of legal fees in the sum of $3,500. Felice, in violation of the court order of December 28, 1981, did not consult with the guardian ad litem before presenting this ex parte order nor did he inform the court that such an order was in existence. The judge authorized the payment of $2,500 to Felice for his services.

A final order removing Felice as guardian was entered on November 16, 1982. He was also ordered to pay back the $2,500 he had previously received. Bar exhibit 1, at 184–85. Felice appealed the decision which was affirmed by the Court of Appeals.

On January 12, 1986, the review committee of the Washington State Bar Association's Disciplinary Board ordered an investigation into the grandniece's complaint about Felice's conduct as Cambern's guardian. In January 1987,

the Washington State Bar Association filed a formal complaint against Felice, charging him with four counts of professional misconduct relating to his performance as guardian for Cambern. A hearing was held, before a hearing panel officer, in Spokane on December 1 through December 2, 1987. On May 20, 1988, this matter was again heard before the Disciplinary Board of the Washington State Bar Association. Now this court takes review pursuant to RLD 7.1(b).

## ANALYSIS

This court will not disturb a hearing examiner's findings of fact made upon conflicting evidence. *In re Simmons,* 110 Wn.2d 925, 928, 757 P.2d 519 (1988). Further challenges to the hearing examiner's conclusions of law will fail if these conclusions are supported by the findings of fact. *In re Selden,* 107 Wn.2d 246, 252, 728 P.2d 1036 (1986).

The first count of the complaint alleged that Felice statutorily failed to appoint a guardian ad litem and to list known relatives pursuant to the guardianship statute, RCW 11.88.030. This statute requires that a guardian ad litem be appointed and that the name of the ward's relatives be listed in the petition. Felice admits his error, but in mitigation he stated he was acting in an emergency situation to recover Cambern's home and securities from the relatives and that he was successful in making the recovery.

The second count concerned Felice's failure to ensure the safety and well being of Cambern and his approval in permitting Kreck to remain as custodian in Portland, after he knew that Cambern was being neglected.

A thorough review of the testimony and exhibits supports the hearing officer's conclusions. There is no question that Felice's failure to consult with the guardian ad litem prior to making the ex parte order authorizing the disbursement of funds was in total disregard of the December 28, 1981, court order.

Felice's conduct in the Cambern guardianship amounts to more than "poor judgement" as found by the Disciplinary Board. In particular, the testimony and exhibits substantiating the appalling conditions in which Cambern was found in October and again in December, with no intervention by Felice, is without question severe neglect of his guardianship duties. There is no mitigation here.

### APPROPRIATE SANCTION

■ The next issue is to determine the appropriate sanctions. The Supreme Court of Washington has exclusive responsibility to determine what discipline should be imposed for a lawyer's acts of misconduct. RLD 2.1. *In re Selden,* 107 Wn.2d 246, 256–57, 728 P.2d 1036 (1986) (Dore, J., concurring). The primary purpose of lawyer discipline cases is to protect the public and preserve confidence in the legal profession and judicial system. *Selden,* at 257. *In re Noble,* 100 Wn.2d 88, 667 P.2d 608 (1983).

■ In deciding on an appropriate sanction, to fulfill the purpose of attorney discipline, this court has adopted the analytical framework proposed by the American Bar Association, *ABA Standards for Imposing Lawyer Sanctions* (1986). *Selden,* at 258; *In re Yates,* 110 Wn.2d 444, 451, 755 P.2d 770 (1988). The framework provides the following four questions for a court to answer in determining an appropriate sanction:

(1) What ethical duty did the lawyer violate? (A duty to a client, the public, the legal system, or the profession?)
(2) What was the lawyer's mental state? (Did the lawyer act intentionally, knowingly, or negligently?)
(3) What was the extent of the actual or potential injury caused by the lawyer's misconduct? (Was there a serious or potentially serious injury?) and
(4) Are there any aggravating or mitigating circumstances?

*ABA Standards,* Theoretical Framework, at 5; *see also* Std. 3.0, at 25.

Duties Breached: We find Felice violated the following ethical duties:

1. RLD 1.1(b) prohibiting an attorney from willfully violating a court order directing him to do an act which he ought in good faith to do.

2. Former CPR DR 6–101(A)(3)[1] prohibiting an attorney from neglecting a legal matter entrusted to him.

Mental State: Felice intentionally violated the court order when he sought an ex parte order for his fees. Felice, subsequent to the October 1981 letter from the Oregon Department of Human Services, had knowledge of Cambern's deplorable living conditions but failed to take any action beyond a few phone calls to rectify the situation.

Injury: His failure to immediately act could have caused Cambern serious harm except for her family's intervention.

Aggravating and Mitigating Factors: The relevant aggravating factors, in this case, as set out by the ABA include:

(g) refusal to acknowledge wrongful nature of conduct;
(h) vulnerability of victim;
(i) substantial experience in the practice of law;

*ABA Standards,* Std. 9.22, at 49. Felice refuses to acknowledge that he did anything wrong. Throughout his testimony before the hearing officer, he believed that he served the guardianship of Verna Cambern very well, since he preserved the assets of the estate. He further believes that he did a good job with the person of Verna Cambern. His client was an 86–year–old incompetent lady. She was vulnerable to the actions or inactions of Felice. Finally, we are not dealing with a young inexperienced attorney, but one that has been actively practicing since 1951. In sum, Felice is guilty of three aggravating factors.

The relevant mitigating factors, in this case, as set out by the ABA include:

---

[1]This is a reference to the Code of Professional Responsibility which was rescinded effective September 1, 1985, by the Rules of Professional Conduct.

(a) absence of a prior disciplinary record;
(b) absence of a dishonest or selfish motive;

*ABA Standards,* Std. 9.32, at 50.

In addition, counsel for the bar stipulated that Felice's adequate job with respect to the financial assets of the estate should be considered mitigation of his conduct in this case. Transcript, at 301. A review of the file convinces us that Felice did an excellent job in making a total recovery of Cambern's assets, including her rooming house. The fact that Felice successfully preserved the property of Verna Cambern is evidence of his good intentions. It is also highly relevant to the absence of a dishonest or selfish motive on Felice's part. Furthermore, Felice, prior to this incident, had an excellent record as an attorney. These intentions and record on behalf of Felice are strong mitigating factors. However, these factors do not excuse Felice's disregard of a court order or his neglect of his guardianship responsibilities to the person of Verna Cambern.

We hold that the appropriate sanction for Felice's disregard of the court order is a letter of censure. The appropriate sanction for his neglect of Verna Cambern is a 30–day suspension of his license to practice law.

Because discipline is imposed by this court, costs may be assessed against Felice pursuant to RLD 5.7(f).

## Conclusion

We find that a letter of censure and a 30–day suspension are the appropriate sanctions. We order Felice to pay costs to the Washington State Bar Association for the prosecution of this disciplinary proceeding pursuant to RLD 5.7(f).

CALLOW, C.J., and UTTER, BRACHTENBACH, ANDERSEN, DURHAM, and SMITH, JJ., concur.

DOLLIVER, J. (dissenting)—The majority overturns a unanimous ruling of the Disciplinary Board that Mr. Felice only be censured by adding to the sanction of censure a 30–day suspension from the practice of law.

In *In re Noble,* 100 Wn.2d 88, 95, 667 P.2d 608 (1983), we stated: "[W]e will adopt the sanction recommended by the Disciplinary Board unless we are able to articulate specific reasons for adopting a different sanction." Although not cited, this salutary rule, until now the law, which gives both credence and deference to the Disciplinary Board, is ignored and surely overruled *sub silentio* (*see In re Selden,* 107 Wn.2d 246, 256, 728 P.2d 1036 (1986) (Dore, J., concurring)) by the majority without even a recognition that it has done so.

Having abandoned the rule, the majority does no more than give a glancing reference to the order of the Disciplinary Board. This simply fails to meet the requirements of *Noble.* Even if the opinion of the majority prevails, Mr. Felice deserves better treatment than this from the highest court in the state.

I find nothing in the *Noble* standards or in their application to this case which persuades me that the unanimous recommendation of a board, whose members include a broad cross section of the bar as well as lay members which modified the ruling of the hearing officer, should be overturned. I would adopt the opinion and sanction of the Disciplinary Board and impose censure on Mr. Felice.

PEARSON, J., concurs with DOLLIVER, J.